LEAH WALTON, Adm'r of the Estate of Trevor P. Walton, Deceased, Plaintiff-Appellant, v. RICHARD V. DIRKES, Defendant-Appellee.

First District (1st Division)   No. 1—08—0461

Opinion filed January 27, 2009.—Rehearing denied February 25, 2009.

Law Office of John F. Klebba, P.C. (John F. Klebba, of counsel), and Law Office of Steven A. Denny, P.C. (Steven A. Denny, of counsel), both of Chicago, for appellant.

Hinshaw & Culbertson, LLP, of Chicago (Stephen R. Swofford, Kevin Joseph Burke, and Christine Olson McTigue, of counsel), for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

The question in this medical malpractice case is whether the plaintiff presented enough evidence to establish a causal connection between the defendant doctor's negligent failure to order a certain blood test and the death of Trevor Walton. The jury thought so, but the trial judge entered a judgment notwithstanding the jury's verdict. We reverse the trial judge's decision and remand this cause for a hearing on any remaining posttrial issues.

FACTS

On April 5, 1999, Trevor Walton went to defendant Dr. Richard Dirkes, his primary care physician, complaining of congestion and a sore throat for the past three weeks. Walton had puffy nasal membranes, no swollen lymph nodes, and his lungs were clear. Defendant told Walton he probably either had allergies or a viral infection. Walton was instructed to call if his symptoms persisted or

increased in severity after three days. Defendant did not order a complete blood count (CBC).

On May 3, 1999, Walton returned to defendant's office complaining of new symptoms, including blood-tinged mucus, pain in his side, abdomen and shoulders, bumps on his head, and difficulty breathing and sleeping. Defendant was diagnosed with chronic rhinitis with pharyngitis—inflammation of the throat. Defendant did not order a CBC.

On May 8, 1999, Walton was taken to Loyola University Hospital's emergency department and treated by Dr. Margaret Grano. Dr. Grano ordered a CBC, which revealed Walton had a white blood cell count of over 540,000. The normal range for white blood cells in a healthy human adult is between 5,000 and 10,000. After Dr. Grano consulted with Dr. John Godwin, a hematologist at Loyola, defendant was diagnosed with acute lymphoblastic leukemia (ALL). An emergency leukophoresis treatment lowered Walton's white blood cell count to around 80,000. Walton died of cardiac arrest related to ALL on May 9, 1999.

Leah Walton, administrator of Trevor Walton's estate, filed a medical malpractice lawsuit, alleging defendant negligently failed to order a CBC on April 5, 1999, and May 3, 1999. Following a jury trial, plaintiff was awarded $3,627,113 in damages. In his posttrial motion, defendant moved for judgment notwithstanding the verdict, or, in the alternative, a new trial.

The trial court entered judgment notwithstanding the verdict in defendant's favor, finding:

> "Here, plaintiff presented no testimony as to what type of specialist should have been consulted to review the CBC results nor was there any testimony as to what that specialist would have seen in the hypothetical CBC results that would indicate ALL. No medical expert testified how a CBC interpreted by anyone would indicate that decedent had ALL. A lack of testimony linking Dr. Dirkes' failure to do a CBC with expert testimony indicating how a diagnosis of ALL could be made from a CBC taken on April 5, 1999, or on May 3, 1999, creates a gap in the evidence of proximate cause fatal to plaintiff's case. Without the testimony discussed above, Dr. Brown's bare assertion that Dr. Dirkes' failure to do a CBC at either office visit caused harm to Trevor Walton is mere conjecture. Therefore, plaintiff failed to prove proximate causation, an essential element of plaintiff's *prima facie* case, and judgment notwithstanding the verdict is proper."

## DECISION

### I. Judgment Notwithstanding the Verdict

Plaintiff contends the trial court erred in entering a judgment notwithstanding the verdict in defendant's favor. Specifically, plaintiff contends the expert testimony contained in the record sufficiently supported the jury's verdict.

Judgment *non obstante veredicto*, or judgment *n.o.v.*, is appropriate where " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 408, 741 N.E.2d 1055 (2001), quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). Judgment *n.o.v.* is appropriate if plaintiff fails to prove an essential element of a negligence action, including proximate cause. *Townsend*, 318 Ill. App. 3d at 408; *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 102, 733 N.E.2d 726 (2000). Our review of an order granting judgment *n.o.v.* is *de novo*. *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 972, 691 N.E.2d 1 (1997).

A plaintiff in a medical malpractice case must prove: "(1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress." *Sunderman v. Agarwal*, 322 Ill. App. 3d 900, 903, 750 N.E.2d 1280 (2001). The central issue in this case turns on whether plaintiff adequately established defendant's allegedly negligent failure to order a CBC was a proximate cause of Walton's injuries.

Proximate cause must be established by expert testimony to a reasonable degree of medical certainty. *Susnis v. Radfar*, 317 Ill. App. 3d 817, 826-27, 739 N.E.2d 960 (2000); *Aguilera*, 293 Ill. App. 3d at 975. Any causal connection between treatment, or a delay in treatment, and the claimed injury must not be "contingent, speculative, or merely possible." *Aguilera*, 293 Ill. App. 3d at 976. While the plaintiff's burden of proof remains the same, our supreme court has recognized proximate cause may be established by evidence that the defendant's negligent conduct "increased the risk of harm" to the patient or "lessened the effectiveness" of the patient's treatment. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 104-05, 679 N.E.2d 1202 (1997).

In *Aguilera*, we considered whether the plaintiff failed to present any evidence of proximate cause in a wrongful death medical malpractice action. Aguilera visited an emergency room with

complaints of numbness on the left side of his body. He began suffering seizures shortly after being admitted to the hospital. A CT scan revealed a massive cerebral hemorrhage. Aguilera lapsed into a coma and died three days later. At trial the plaintiff, Aguilera's wife, offered testimony from two expert witnesses that the emergency room physician should have ordered an immediate CT scan, given Aguilera's condition.

Dr. Hamilton, the emergency medicine expert, testified the delayed CT scan "definitely related" to Aguilera's death. *Aguilera*, 293 Ill. App. 3d at 969. Dr. Hamilton admitted, however, that even assuming Aguilera had received a prompt CT scan he would have deferred to a neurosurgeon to decide whether surgical intervention was necessary. The plaintiff's neurology expert, Dr. Vuckovich, testified an early CT scan was critical not only to permit effective treatment of the patient, but also to determine the precise location and size of the hemorrhage while still treatable. Dr. Vuckovich did not know, however, whether surgical intervention would have been ordered had a prompt CT scan been administered. The trial court entered judgment notwithstanding the verdict for the defendant.

Affirming the judgment *n.o.v.*, we held:
> "The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case. *** Plaintiff failed to offer evidence to a reasonable degree of medical certainty that the alleged negligent delay in administering the CT scan lessened the effectiveness of the medical treatment given to Aguilera." *Aguilera*, 293 Ill. App. 3d at 975.

No evidence supported the plaintiff's experts' opinion that the negligent delay in administering the CT scan lessened the effectiveness of treatment. *Aguilera*, 293 Ill. App. 3d at 974. We held "[w]hen there is no factual support for an expert's opinion, the conclusions alone do not create a question of fact." *Aguilera*, 293 Ill. App. 3d at 974.

In *Townsend*, the plaintiff contended an imaging study should have been performed in the emergency room to diagnose a urinary tract obstruction. Dr. Leslie and Dr. Hancock, plaintiff's experts, both testified the defendant deviated from the standard of care. When Dr. Leslie was asked what the defendant would have done if she had complied with the standard of care and immediately ordered an imaging study, Dr. Leslie said " '[s]he would call another type of physician, once she made the diagnosis.' " *Townsend*, 318 Ill. App. 3d at 411. On

cross-examination, Dr. Leslie said an imaging test would have increased Puckett's chance of survival, even if it may not have saved her life. Dr. Hancock testified Puckett's chance of survival would approach zero without having the obstruction removed. She would have had a 40% to 60% survival rate if the obstruction had been diagnosed and treated in the emergency room. On cross-examination, the defendant's attorney asked Dr. Hancock the following questions:

" 'Q. Now, it's your opinion that had she [the defendant] ordered this test, a [kidney stone] might have been seen ***, right?

A. It might have been seen at the location of the stone of the ureter [found at Puckett's autopsy].

Q. You further testified that if it had been identified, it would require immediate attention, correct?

A. Yes.

Q. You're not the type of doctor that would provide that next intervention, are you?

A. No, that's correct.

Q. What type of doctor would do that?

A. One of two types, a urologist or an interventional radiologist.

Q. Both of which are outside your area of expertise, correct?

A. Yes.' " *Townsend*, 318 Ill. App. 3d at 412.

Considering *Aguilera*, we asked whether the record contained any evidence to support the opinion of the plaintiff's experts that the negligent delays—an imaging test or transferring Puckett to the emergency room—" 'lessened the effectiveness of treatment?' " *Townsend*, 318 Ill. App. 3d at 413, quoting *Aguilera*, 293 Ill. App. 3d at 974. Because there was no expert testimony that an earlier imaging test or an earlier transfer to an intensive care unit would have led to surgical intervention or other treatment that may have contributed to Puckett's recovery, we concluded the jury was left to speculate about proximate cause. *Townsend*, 318 Ill. App. 3d at 413. Simply saying Puckett's chances of survival would go from 0% to 60% if "relief" had been provided did not address the causation gap. We vacated the jury's verdict in favor of the plaintiff and remanded the cause to the trial court with directions to enter judgment in favor of the defendant. *Townsend*, 318 Ill. App. 3d at 412.

Similarly, in *Susnis v. Radfar*, 317 Ill. App. 3d 817, 827-29, 739 N.E.2d 960 (2000), the plaintiffs contended that had the radiologist properly interpreted an X-ray, subsequent doctors would have had the opportunity to treat the child's enlarged heart condition and possibly avoid or minimize her injuries. A review of the record established the plaintiffs' experts offered only an opinion on the radiologist's deviations from the standard of care, but no expert evidence was adduced

to a reasonable degree of medical certainty that the radiologist's deviations proximately caused the child's injuries. We affirmed the trial court's directed verdict in favor of the radiologist, holding the mere possibility of a causal connection was not enough to sustain the burden of proving proximate cause. See also *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 299, 895 N.E.2d 1067 (2008) ("Although both of plaintiff's medical experts agreed Dr. Searle deviated from the proper standard of care by failing to order a CT scan or neurological consult while treating Wiedenbeck, we find no expert evidence was offered to a reasonable degree of medical certainty that Dr. Searle's alleged deviation caused Wiedenbeck's injuries or lessened the effectiveness of her medical treatment").

In order to test the trial court's judgment notwithstanding the verdict order, we have extracted facts from the record that tell the strongest story in support of the jury's verdict. It is not necessary for a single expert witness to establish the plaintiff's entire case. Instead, it is only necessary that the evidence and testimony, as a whole, convey to the jury sufficient facts to enable it to form a judgment in the matter. See *Chicago Union Traction Co. v. Lawrence*, 211 Ill. 373, 375, 71 N.E. 1024 (1904).

Plaintiff did not allege defendant deviated from the standard of care by failing to diagnose ALL. Instead, plaintiff alleged defendant deviated from the standard of care by not performing a CBC on either April 5, 1999, or May 3, 1999. Plaintiff alleged defendant's failure to order a CBC on those dates harmed Walton because a CBC would have led to the diagnosis and treatment of ALL.

Dr. Finley Brown, a family medicine physician, testified defendant deviated from the standard of care by failing to order a CBC when he examined defendant on April 5 and May 3. With regard to the April 5 examination, Dr. Brown said:

"I believe Dr. Dirkes deviated from the standard of care by not ordering a complete blood count because, *** this patient had been ill for three weeks, but he didn't have a fever, but he had symptoms like upper respiratory infection which often is accompanied by fever. And because he did not I believe—and so I believe he deviated from the standard of care by not drawing a CBC and having it processed so he could see—so he could rule out other conditions."

Dr. Brown testified a CBC done on April 5 "more likely than not" would have been "abnormal." Dr. Brown said "[i]t would have given a hint that something else was going on and would have led to the diagnosis of acute lymphoblastic leukemia."

With regard to the May 3 examination, Dr. Brown was asked whether the "treatment" Dr. Dirkes rendered fell below the standard

of care for a reasonably well-trained and qualified family care practitioner. Dr. Brown said he believed it did. When asked how so, he testified "the failure to do a CBC on either the 5th and again on May 3, 1999 hurt Trevor Walton."

Dr. Leon Dragon, plaintiff's oncology expert, testified ALL cannot be diagnosed without doing blood work. Dr. Dragon explained: "So patients will present often with somewhat nonspecific symptoms of fatigue, perhaps low-grade fever, not feeling well. And a blood count will be abnormal." He testified the 50 or 60 ALL patients he treated during his career as an oncologist were diagnosed when "[a] blood count was done that was abnormal." On cross-examination, Dr. Dragon explained: "[an ALL diagnosis] is made by looking at the bone marrow in the peripheral blood, along with some ancillary, very high-tech studies to define what type of cell is there. So you have to look at the bone marrow and see that it is populated by these immature cells."

When asked what type of treatment is available for ALL, Dr. Dragon testified:

"Well, once the diagnosis is made, there are some very specific chemotherapy treatments that are given. *** Chemotherapy involves the administration of various drugs that are active against certain malignancies, and different malignancies are treated with different chemotherapy drugs. *** In adult ALL, with very intensive chemotherapy regimens *** the cure rates may approach 50 to 60 percent. So this is a very treatable malignancy with a substantial cure rate."

Dr. Dragon testified that, given Walton's white blood count on May 8, 1999, of 540,000, he believed Walton would have had abnormal blood counts for at least several months prior to his presentation in May. When asked to quantify to a reasonable degree of medical certainty Walton's chances of surviving ALL if a blood count had been done on April 5, 1999, Dr. Dragon said:

"Well, I believe the blood count would have been abnormal and would have clearly documented the need for further studies, and I believe his white count would have been elevated. *** He would have fallen into the group of patients that we consider to be fairly standard-presenting patients with ALL. *** So I believe in April, had he had a blood count, that it would have been abnormal and he would have been treated for ALL. Any similar population of patients would be expected to have a 40 percent cure rate."

Dr. Dragon was also questioned regarding Walton's chance of survival had a blood count been done on May 3, 1999:

"Q. Now, can you quantify to a reasonable degree of medical certainty what Trevor Walton's chances of surviving ALL were if a blood count had been done on May 3rd, 1999?

A. Well, I—I estimated his risk for relapse would have been higher by May 3rd because the number of leukemic cells would have been much greater than in April. *** So I would have estimated a similar population would have had a lower cure rate, perhaps 10 to 30 percent, but still would have been treatable and potentially curable at that point.

Q. Dr. Dragon, the time from May 4th to May 9th is only five days. How can a five-day period allow enough time to save Trevor Walton from death on May 9th, 1999?

A. Well, when he came in on May 9th or the—late on May 8th, I think, he was—how I would describe it—in extremis; meaning he was already minutes to a couple hours from death. And that really leaves very little time to manage the underlying condition. Because so many systems are failing, he had to immediately be intubated, and it's just impossible to adequately treat somebody with such a complex disease in that time frame. Five days earlier, he certainly would have had a very high white count, but they would have had time to remove some of the white blood cells mechanically by a process called leukopheresis, and they would have had time to treat him. He could have been treated very quickly because the diagnosis can be made very rapidly and chemotherapy can be introduced very quickly. And, in fact, I've treated patients like this myself where, you know, one can turn this around very rapidly. But you have to have a couple of days to be able to do this. You can't do it in a couple of minutes."

Dr. Dragon testified he believed Walton would not have died on May 9 had he been diagnosed and started treatment immediately following either the April 5 or May 3 office visit. Even with relapse, Dr. Dragon testified, defendant's life would have been prolonged for approximately two years.

Dr. Godwin, the hematologist who treated Walton at Loyola Hospital, testified blood taken from a CBC test on April 5 would have been abnormal. Dr. Godwin testified a CBC conducted on May 3, 1999, "would be significantly abnormal and all—certainly show signs of leukemia." Dr. Godwin said Walton's chances of survival would have been greater had a diagnosis of ALL been made on blood tests conducted on April 5 or May 3.

Dr. Steven Eisenstein, defendant's family practitioner expert, testified he believed an ALL diagnosis would "more likely than not have been obtained" had defendant drawn blood on May 3. However, Dr. Eisenstein testified defendant's failure to draw blood for a CBC on April 5, 1999, or May 3, 1999, was not a violation of the applicable standard of care.

Dr. Richard Larson, defendant's oncology expert, testified it would

have been speculative as to whether a lab report of Walton's blood drawn on April 5 would have detected signs of ALL. When asked whether he had previously testified in his discovery deposition that a lab report for blood drawn on May 3 would have included signs of ALL, Dr. Larson said "there would have been an abnormality detected in [Walton's] blood" on May 3. On cross-examination, Dr. Larson agreed part of the license for clinical laboratories requires reporting lab results from blood work to the doctor requesting the results within 24 hours if there are panic or critical results.

In *Wodziak v. Kash*, 278 Ill. App. 3d 901, 663 N.E.2d 138 (1996), the plaintiff's decedent went to a hospital emergency room complaining of shortness of breath. The defendant diagnosed a respiratory stridor—a blocked throat whistle—and released decedent. After losing consciousness two days later, the decedent was taken to a different hospital where doctors discovered a tracheal obstruction. During the emergency surgery that followed, the decedent suffered a stroke and developed permanent brain damage. Plaintiff alleged the defendant's delay in investigating the cause of the stridor postponed treatment and caused decedent's injury.

We affirmed a verdict for the plaintiff, noting the plaintiff's expert testified to a specific procedure—throat dilatation—that was postponed by the negligently delayed diagnosis. *Wodziak*, 278 Ill. App. 3d at 912. That is, the defendant's negligent delay in investigating the cause of the patient's stridor lessened the effectiveness of a "definitive treatment."

More recently, in *Johnson v. Loyola University Medical Center*, 384 Ill. App. 3d 115, 893 N.E.2d 267 (2008), we considered whether the trial court improperly granted judgment *n.o.v.* on the issue of proximate cause in a medical malpractice action. After Johnson suffered a cardiopulmonary arrest, he was admitted to the defendant's cardiac care unit on June 1, 1995. Johnson was transferred to a general medical floor on June 4, without continuous telemetry or oxygen monitoring. Johnson suffered another cardiac arrest on June 5. He was resuscitated but did not regain consciousness. A neurological assessment showed irreversible brain damage as a result of prolonged oxygen deprivation. The sole issue presented to the jury was whether defendants negligently failed to continuously monitor Johnson's EKG and oxygen saturation.

We reversed the trial court's judgment *n.o.v.* We held the plaintiff provided evidence that the failure to monitor Johnson proximately caused his injuries. *Johnson*, 384 Ill. App. 3d at 121-22. We noted the plaintiff's expert specifically testified that:

"with adequate monitoring, changes in Johnson's heart rate,

cardiac status, or oxygen level would have caused earlier intervention, 'and I think that he would have been treated for his impending cardiac arrest in a much quicker time and, therefore, wouldn't have had the brain damage from the cardiac arrest he had.' However, by the time staff had intervened, 'at that point it took so long to get the circulation back up that he had a lack of oxygen to the brain and had severe irreversible brain damage which ultimately led to his death after that.' " *Johnson*, 384 Ill. App. 3d at 121-22.

We noted similar expert testimony was held sufficient in *Wodziak* and *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997).

In *Holton*, the plaintiff became paralyzed as a result of the defendants' failure to timely diagnose and treat pressure on her spinal cord caused by a fractured vertebra. After the jury returned a verdict in the plaintiff's favor, the defendants contended they were entitled to judgment *n.o.v.* because the plaintiff failed to present expert testimony that an earlier call to her physicians about her progressive weakness would have prevented her paralysis. Rejecting the defendants' contention, the supreme court held the plaintiff was not required to prove an earlier call to her doctors would have resulted in a more favorable outcome. *Holton*, 176 Ill. 2d at 107-08.

The plaintiff's experts testified that when a patient's partial paralysis is detected and treated early enough, there is a good probability of avoiding or minimizing paralysis, and that, to a reasonable degree of medical certainty, the preferred treatment for relieving pressure on the spinal cord caused by an abscess or edema is decompression or drainage. The supreme court held that "[h]ad the doctors been given the opportunity to properly diagnose [the plaintiff's] condition based on accurate and complete information, they would have had the opportunity to treat her condition by ordering the appropriate treatment." *Holton*, 176 Ill. 2d at 108. Because of the hospital's negligent failure to accurately and timely report the plaintiff's symptomology, the appropriate treatment was not even considered. *Holton*, 176 Ill. 2d at 108.

Unlike in *Aguilera, Townsend*, and *Susnis*, the plaintiff in this case offered evidence to a reasonable degree of medical certainty that defendant's negligent failure to order a CBC on April 5, 1999, and May 3, 1999, resulted in a delayed diagnosis of ALL and lessened the effectiveness of Walton's medical treatment. Plaintiff's oncology expert, Dr. Dragon, did more than simply say Walton's chance of survival would go from 0% to 40% if treatment had been provided. Instead, similar to *Wodziak, Johnson*, and *Holton*, plaintiff's oncology expert testified to specific procedures—leukopheresis and chemo-

therapy—that were delayed by defendant's failure to order a CBC on April 5 and May 3.

The strongest evidence of proximate cause in this case is Dr. Dragon's testimony regarding how Walton would have been treated had defendant ordered a CBC during Walton's May 3 office visit. Dr. Dragon testified that, given Walton's white blood count on May 8, 1999, of 540,000, he believed Walton would have had abnormal blood counts for at least several months prior to his presentation in May. Dr. Dragon said that on May 3, five days prior to Walton's hospitalization, Walton "certainly would have had a very high white count, but they would have had time to remove some of the white blood cells mechanically by a process called leukopheresis, and they would have had time to treat him."

When Walton was diagnosed and treated on May 8, Dr. Dragon explained, he was already "in extremis; meaning he was already minutes to a couple hours from death." Dr. Dragon stressed Walton "could have been treated very quickly" if a CBC had been ordered on May 3 "because the diagnosis can be made very rapidly and chemotherapy can be introduced very quickly." He noted, in fact, that he had "treated patients like this myself where, you know, one can turn this around very rapidly."

Defendants' experts, Dr. Eisenstein and Dr. Larson, agreed a CBC would have detected an abnormality in Walton's blood during the May 3 office visit. Dr. Eisenstein admitted on cross-examination that an ALL diagnosis would "more likely than not have been obtained" had defendant drawn blood on May 3. Although Dr. Eisenstein asserted Dr. Dirkes did not violate the standard of care by failing to order a CBC on April 5 or May 3, his testimony was contradicted by Dr. Brown, plaintiff's family physician expert. The credibility and weight of the conflicting witnesses' opinions on the proper standard of care was a jury question. See *Maple v. Gustafson*, 151 Ill. 2d 445, 452, 603 N.E.2d 508 (1992) ("Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony").

Dr. Grano, the emergency room physician, and Dr. Godwin, the hematologist, treated Walton at Loyola Hospital. Each testified regarding how Walton was diagnosed with ALL. Dr. Grano testified she contacted Dr. Godwin "immediately" after a blood count revealed a white blood cell count of 540,000. Dr. Grano testified Dr. Godwin:

> "helped confirm that white count represented in the setting of a young man his age with a wide mediastinum on chest X-ray fit the picture of an acute lymphocyctic leukemia, and what treatment he

would require, and given the clinical presentation, that much of what was occurring was due to white cells—\*\*\*—and that they needed to be removed urgently."

Dr. Godwin testified regarding how he confirmed his initial diagnosis of acute leukemia:

"My review of the peripheral blood smears suggested a myeloid leukemia, AML. There are numerous blasts. I list here more than 50%, 60 to 80%, and I would have reviewed a smear that morning before coming up to the ICU not knowing he was coding that morning, and so this note reflects my having gone, looked at that smear for strain."

Dr. Godwin eventually concluded Trevor had ALL.

Dr. Grano and Dr. Godwin provided a sufficient causal connection regarding how diagnosis and treatment would have resulted from a CBC conducted by defendant. Taken together, the expert testimony presented at trial adequately supported the jury's verdict. The trial court erred in entering judgment notwithstanding the verdict in defendant's favor. See *Holton*, 176 Ill. 2d at 109.


II. Motion for New Trial

Defendant contends he is entitled to a new trial due to numerous errors that occurred during trial. Defendant properly filed a motion for new trial in the trial court.

Plaintiff contends defendant forfeited review of his motion for a new trial by failing to seek a conditional ruling on the motion, citing *Johnson v. Loyola University Medical Center*, 384 Ill. App. 3d 115, 125, 839 N.E.2d 267 (2008) ("We find, however, that defendants waived these arguments when they failed to secure a conditional ruling on their alternative motion for new trial, as required by section 2—1202(f) of the Code of Civil Procedure (735 ILCS 5/2—1202(f) (West 2004))").

Here, the trial court found defendant was entitled to judgment notwithstanding the verdict and said it would "only address that issue." In light of the trial court's specific refusal to consider the motion for new trial, we see no reason to apply forfeiture. We reverse the trial court's order granting judgment *n.o.v.* and remand the cause for a hearing on any remaining posttrial issues.

Reversed and remanded.

HALL and GARCIA, JJ., concur.