# Illinois Official Reports

## Appellate Court

*Hemminger v. LeMay,* 2014 IL App (3d) 120392

| | |
|---|---|
| Appellate Court Caption | DANIEL R. HEMMINGER, Individually and as Special Administrator of the Estate of Tina M. Hemminger, Deceased, Plaintiff-Appellant, v. JEFFREY LEMAY, M.D., STERLING ROCK FALLS CLINIC, LTD., an Illinois Corporation, Defendants-Appellees. |
| District & No. | Third District<br>Docket No. 3-12-0392 |
| Filed<br>Modified upon<br>denial of rehearing | January 21, 2014<br><br>June 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In plaintiff's medical malpractice action alleging that defendant physician's negligence in failing to timely diagnose the cervical cancer suffered by plaintiff's wife proximately caused her death by lessening her chance of survival, plaintiff was only required to show that defendant's negligence increased a risk of harm or a lost chance of recovery, not that she would have survived absent defendant's negligence, and the testimony presented by plaintiff's sole expert was sufficient to create a triable issue of fact as to proximate cause and withstand defendant's motion for a directed verdict. |
| Decision Under Review | Appeal from the Circuit Court of Whiteside County, No. 05-L-39; the Hon. Stanley B. Steines, Judge, presiding. |
| Judgment | Reversed; cause remanded. |

Counsel on
Appeal

Darlene D. Soderberg, of Soderberg & Associates, P.C., of Rockford, Anthony C. Raccuglia, of Anthony C. Raccuglia & Associates, P.C., of Peru, and Lawrence R. Kream (argued), of Law Office of Lawrence R. Kream, LLC, of Chicago, for appellant.

Timothy G. Shelton (argued) and Jerrod L. Barenbaum, both of Hinshaw & Culbertson, LLP, of Chicago, for appellees.

Panel

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices O'Brien and Schmidt concurred in the judgment and opinion.

## OPINION

¶ 1     In this medical malpractice action, the plaintiff, Daniel R. Hemminger (Hemminger), sued defendants Jeffrey LeMay, M.D., and Sterling Rock Falls Clinic, Ltd., seeking damages for the death of his wife, Tina. Hemminger alleged that the defendants' negligent failure to diagnose Tina's cervical cancer in a timely fashion proximately caused her death by lessening her chance of survival. The trial court granted the defendants' motion for a directed verdict, finding that Hemminger failed to present evidence sufficient to establish that Dr. LeMay's negligence proximately caused Tina's death under a lost chance of survival theory. This appeal followed.

¶ 2                                      FACTS

¶ 3     Tina saw Dr. LeMay, an obstetrician/gynecologist, on June 23, 2000, complaining of abdominal pain on her right side and spotting in the recent past. Dr. LeMay performed a pelvic examination, which showed that Tina's cervix was abnormally large and firm. However, Dr. LeMay did not biopsy Tina's cervix or order a microscopic examination of her cervix at that time. Approximately six months later, Tina was diagnosed with cervical cancer. By that time, her cancer was at Stage 3B, which has a five-year survival rate of 32%. Tina died of metastatic cervical cancer on April 7, 2002.

¶ 4     Hemminger sued Dr. LeMay for medical malpractice alleging that Dr. LeMay negligently failed to order tests (such as a cervical biopsy or colposcopy[1]) that would have detected Tina's cervical cancer in June 2000. He claimed that, had Dr. LeMay diagnosed Tina's cancer in June 2000 rather than in December 2000, Tina would have had a significantly better chance of surviving her cancer.

_____
[1]A colposcopy is a microscopic examination of the cervix.

- 2 -

¶ 5        Dr. Margaret Pfister, a board-certified obstetrician and gynecologist, was Hemminger's sole expert witness at trial. As a general gynecologist, Dr. Pfister does not treat cervical cancer. She refers patients with cervical cancer to a gynecological oncologist. However, Dr. Pfister testified that she counsels such patients on their likely prognoses. Dr. Pfister stated that she had undergone three months' training dedicated to gynecologic oncology and that she regularly read textbooks and journal articles on cervical cancer. She also testified that she regularly read the journal published by the American Congress of Obstetricians and Gynecologists (ACOG), including ACOG's publications on the staging and prognosis of cervical cancer.

¶ 6        Dr. Pfister testified that she was familiar with the staging system for cervical cancer devised by the Federation of International Gynecologic Oncologists (FIGO), and that she used the FIGO staging system when advising her patients. She stated that the FIGO staging system identifies four broad categories of cervical cancer. Stage 1 is cancer limited to the cervix. In Stage 2A, the cancerous tumor has spread from the cervix vertically down the vagina, but has not reached the lower third of the vagina. A Stage 2B tumor spreads outward (laterally) from the cervix. A Stage 3A tumor is one that has spread vertically down from the cervix all the way to the lower portion of the vagina. A Stage 3B tumor has spread laterally from the cervix into the pelvic sidewall. Stage 4A is cancer that reaches the bladder and rectal mucosa. Stage 4B occurs when the cancer spreads outside of the pelvis. By the time Tina's cancer was discovered in December 2000, it was at Stage 3B (*i.e.*, it had spread laterally from the cervix into the pelvic sidewall).

¶ 7        Dr. Pfister testified to a reasonable degree of medical certainty that, when Dr. LeMay examined Tina on June 23, 2000, Tina's cervical cancer was either at Stage 1 or at Stage 2B. Dr. Pfister concluded that Tina could not have had a Stage 3 cervical cancer at that time because a Stage 3 tumor extends to the pelvic wall, involves the lower third of the vagina, or causes kidney injury (or some combination of these factors), and none of these things were described by Dr. LeMay in June 2000. Further, Dr. Pfister opined that Tina did not have a Stage 2A cancer at that time because a tumor extending down into the vagina from the cervix should be "pretty obvious" to an experienced gynecologist like Dr. LeMay, and Dr. LeMay did not describe any such tumor when he examined Tina on June 23, 2000.[2] However, Dr. Pfister conceded that she could not rule out the possibility that there was some lateral spread of the cancer by June 2000. Thus, she concluded that the cancer could have reached Stage 2B at that time.

¶ 8        Based on survival data published by the American Cancer Society for women diagnosed with cervical cancer between 2000 and 2002 (which provide survival rates for each stage of the FIGO system), Dr. Pfister testified that: (1) the five-year survival rate for women with Stage 1 cervical cancer is 80% to 90%; (2) the five-year survival rate for women with Stage 2B cervical cancer is 58%; and (3) when Tina was diagnosed with Stage 3B cervical cancer in December 2000, her five-year survival rate was 32%. Accordingly, based on the FIGO staging system, the American Cancer Society survival statistics, and her education, training, and experience, Dr. Pfister opined that Dr. LeMay's negligent failure to diagnose Tina's

_____

[2]Dr. Pfister also noted that, when Tina was seen by her family physician, Dr. Raime, in September 2000, Dr. Raime performed a pelvic examination and did not report seeing any tumor extending into the vagina.

cervical cancer on June 23, 2000, caused Tina's chances for survival to decrease from between 58% to 63% (assuming the cancer was at Stage 2 at that time) to 32%. She also testified that the earlier one is able to make the diagnosis of cervical cancer, the sooner the patient is able to undergo treatment, and thus the better the outcome will be for the patient.

¶ 9        The American Cancer Society's survival rate table for cervical cancer (the table upon which Dr. Pfister relied in rendering her causation opinion) includes the following disclaimer:

> "Survival rates are often based on previous outcomes of large numbers of people who had the disease, but they cannot predict what will happen in any particular person's case. Many other factors may affect a person's outlook, such as their general health and how well the cancer responds to treatment. Your doctor can tell you how the numbers below may apply to you, as he or she is familiar with the aspects of your particular situation."

During cross-examination, Dr. Pfister acknowledged that the table provided "general information rather than specific information" and that it "isn't supposed to tell any one person what their chance of survival is."

¶ 10        Dr. Pfister agreed that there were many factors that can affect a specific patient's chances of surviving cervical cancer, including: (1) the patient's general health at the time of diagnosis; (2) the histological characteristic of the cancer (*i.e.*, whether it is squamous cell cancer or adenocarcinoma); (3) whether the patient's cancer is well differentiated, moderately differentiated, or poorly differentiated; (4) whether the cancerous tumor is "exophytic" (*i.e.*, growing outward from the cervix) or "endophytic" (*i.e.*, growing inward within the cervix); and (5) whether the patient's cancer is responsive to chemotherapy and radiation.[3] Dr. Pfister did not consider any of these factors in determining Tina's chance for survival. She testified that the American Cancer Society table does not break down survival rates based upon these factors. Moreover, Dr. Pfister stated that she was not a gynecological oncologist and that she did not have the expertise to apply these additional variables to the survival rate statistics in calculating what Tina's survival rate was in June, September, or December 2000. Dr. Pfister testified that Tina's cervical cancer was a moderately differentiated, squamous cell carcinoma, and she acknowledged that a gynecologic oncologist might be able to offer an opinion as to a specific individual's chance of survival based upon a consideration of both the general survival rates and the oncologist's "experience with moderately differentiated cancer or squamous carcinoma." However, Dr. Pfister conceded that she lacked the expertise to offer such an opinion.

¶ 11        Dr. Pfister testified that the only treatments available for cervical cancer are chemotherapy, radiation, and, in some cases, surgery. After her cancer was diagnosed in December 2000, Tina received only chemotherapy and radiation. Dr. Pfister acknowledged that Tina responded poorly to treatment at that time. She testified that she "wouldn't know" how Tina would have responded to treatment if she had been diagnosed and treated in June 2000 rather than in December 2000. Dr. Pfister did not say what the specific course of

---

[3] Dr. Pfister was asked about the effect of other factors, such as whether the cancer was "keratinizing" or "nonkeratinizing," and, if nonkeratinizing, whether it was "small cell" or "large cell" cancer. The doctor responded that it was not possible for anyone to know whether these factors affect any individual patient's survival rate.

treatment would have been if Tina had been diagnosed in June 2000 or how such treatment might have differed from the treatment she received in December 2000.

¶ 12    At the close of Hemminger's case, the defendants moved for a directed verdict. The defendants argued that Hemminger had failed to meet his burden of proving proximate causation by establishing that the defendants' negligence lessened Tina's chance of survival. The trial court agreed. The trial court noted that the relevant case law established that proximate causation may not be speculative, *i.e.*, a plaintiff may not establish proximate causation "based on mere possibilities" or generalities. The trial court interpreted this rule as requiring the plaintiff to do more than merely state the general proposition that "the earlier diagnosis [occurs] the better your chances are." The trial court ruled that the plaintiff must be able to make a "connection between the general rule" and "the specific instance we have in this matter." The court found that Dr. Pfister failed to make such a connection because she offered only: (1) generalized evidence about the staging of cervical cancer in group populations based upon the American Cancer Society's survival rate table; and (2) a general opinion that an earlier diagnosis leads to better results. As the trial court put it:

> "Dr. Pfister *** was not able to connect those tables, those *** general circumstances up to *** the circumstances for [Tina]. She wasn't able to make that causal connection, *** other than being speculative, mere possible or contingent. She couldn't speak to treatment or what would happen if this treatment were provided or even what kind of treatment should be provided. She could just talk about the staging and the survival rates and again, all speaking generally, not making that specific connection that needs to be made in a medical malpractice case."

¶ 13    Accordingly, the trial court granted the defendants' motion for a directed verdict. The trial court based its decision primarily on its review of the cases provided by the defendants. The court noted that, before reading the case law, it would have thought that the evidence provided by Dr. Pfister "would have been enough to carry the day." However, the court observed that the case law established that "that isn't the case." The court stated that this was "probably one of the more difficult decisions that this Court has made."

¶ 14                                    ANALYSIS

¶ 15    One of the elements of a medical malpractice claim is an injury proximately caused by the physician's lack of skill or care. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). To establish proximate causation, a plaintiff must prove that the defendant's negligence " 'more probably than not' " caused the plaintiff's injury. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997).

¶ 16    In this case, Hemminger proceeded under the "lost chance" theory of recovery. This theory "refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Id.* at 111. In *Holton*, our supreme court stated, "[t]o the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Id.* at 119. To make this showing, a plaintiff is not required to prove that she would have had a greater than 50% chance of survival or recovery

absent the alleged malpractice. *Id.* Nor is the plaintiff required to prove that " 'a better result would have been achieved absent the alleged negligence of the doctor.' " *Id.* at 106 (quoting *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424 (1975)).

¶ 17    Hemminger argues that the trial court erred in granting the defendants' motion for a directed verdict on the issue of proximate causation. "Issues involving proximate cause are fact specific and therefore uniquely for the jury's determination." *Holton*, 176 Ill. 2d at 107.[4] A trial court may grant a directed verdict only in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967); see also *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). A trial court should grant a directed verdict for the defense only where the plaintiff has failed to establish a *prima facie* case. See *Sullivan*, 209 Ill. 2d at 123. A plaintiff establishes a *prima facie* case by "presenting *some* evidence on every essential element of the cause of action." (Emphasis added.) *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, ¶ 63, *appeal denied*, No. 116076 (Ill. Sept. 25, 2013); *Davis v. Kraff*, 405 Ill. App. 3d 20, 31 (2010). In ruling on a motion for a directed verdict "a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therfrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992).

¶ 18    Because a trial court cannot weigh or judge the credibility of witnesses in deciding a motion for a directed verdict, the reviewing court need not give substantial deference to the trial court's ruling. *City of Mattoon v. Mentzer*, 282 Ill. App. 3d 628, 633 (1996). Therefore, we review a trial court's ruling on a motion for directed verdict *de novo*. *Krywin*, 238 Ill. 2d at 225; *Perkey*, 2013 IL App (2d) 120470, ¶ 54.

¶ 19    In granting the defendants' motion for a directed verdict in this case, the trial court found that Hemminger had failed to present evidence that Dr. LeMay's negligent failure to diagnose Tina's cervical cancer in June 2000 contributed to Tina's death or lessened her chance of survival. We disagree. Dr. Pfister opined that Dr. LeMay's negligent failure to diagnose Tina's cervical cancer on June 23, 2000, caused Tina's chances for survival to decrease. Although Dr. Pfister could not say with certainty what stage Tina's cervical cancer had reached by June 2000, she testified to a reasonable degree of medical certainty that, when Dr. LeMay examined Tina on June 23, 2000, Tina's cancer was either at Stage 1 or at Stage 2B. Dr. Pfister noted that, according to survival data published by the American Cancer Society, the five-year survival rate for women with Stage 1 cervical cancer is 80% to 90%, and the five-year survival rate for women with Stage 2B cervical cancer is 58%. By the time Tina was diagnosed with Stage 3B cervical cancer in December 2000, her five-year survival rate had dropped to 32%. Accordingly, based on the FIGO staging system, the American Cancer Society survival statistics, and her education, training and, experience, Dr. Pfister opined that Dr. LeMay's negligent failure to diagnose Tina's cervical cancer on June 23, 2000, caused Tina's chances for survival to decrease. Dr. Pfister's testimony supports a

---

[4]See *Holton*, 176 Ill. 2d at 107 ("When a plaintiff comes to a hospital already injured, *** or has an existing undiagnosed medical condition, *** and while in the care of the hospital is negligently treated, the question of whether the defendant's negligent treatment is a proximate cause of plaintiff's ultimate injury is ordinarily one of fact for the jury.").

reasonable inference that the six-month delay in diagnosing Tina's cancer caused Tina to lose a 26% chance of survival if her cancer was at Stage 2B in June 2000,[5] and a 48% to 58% chance of survival if her cancer was at Stage 1 in June 2000.

¶ 20   Our appellate court has held that the type of evidence presented by Dr. Pfister in this case is sufficient to establish a *prima facie* case of proximate causation and to survive a motion for directed verdict. See *Perkey*, 2013 IL App (2d) 120470, ¶¶ 64-65. In *Perkey*, the administrator of the estate of Leanne Perkey (Perkey) brought a medical malpractice action against Perkey's physician's estate and his clinic after Perkey died from pancreatic cancer. *Id.* ¶ 1. The plaintiff claimed that the physician's delay in diagnosing Perkey's cancer caused Perkey to lose a chance for a cure and was a cause of her death. Dr. Lowy, a surgical oncologist, testified for the plaintiff on the issue of causation. *Id.* ¶¶ 16-23. After identifying a document showing survival rates for each stage of pancreatic cancer, Dr. Lowy opined that the delay in diagnosing Perkey's cancer was a cause of the recurrence of her pancreatic cancer and a cause of her death. *Id.* ¶¶ 19-20, 64. He also opined that the delay caused Perkey to lose a chance at a cure. *Id.* ¶¶ 19, 64. Dr. Lowy testified that, when Perkey's cancer was removed, it was Stage 2B, giving her a 6% chance of a five-year survival. *Id.* ¶¶ 21, 64. Although Dr. Lowy conceded that it was " 'impossible to say' " with certainty at what stage Perkey's cancer was at the time she was initially examined by her physician in February 2001, he opined to a reasonable degree of medical certainty that it was likely a Stage 2A at that time, and it could have been at Stage 1. *Id.* ¶ 64. Dr. Lowy testified that, if it was at Stage 2A, Perkey was twice as likely to be cured at that time than she was when her cancer progressed to Stage 2B, and if it was a Stage 1, she was six times more likely to be cured. *Id.* ¶¶ 21, 64. In either case, according to Dr. Lowy, Perkey's cancer "would have been at an earlier stage [in February 2001] and therefore her chances for a cure would have been greater." *Id.* ¶ 23. In sum, Dr. Lowy "testified that [Perkey] would have had a greater chance of recovery had she been diagnosed and treated in February 2001, because he believed that her cancer was at an earlier stage at that time." *Id.* ¶ 66. Based entirely on a consideration of Dr. Lowy's testimony, our appellate court held that the plaintiff had "presented some evidence that [plaintiff's physician's] alleged negligence, which resulted in [Perkey] not being diagnosed with cancer in February 2001, decreased her chances of recovering from the disease." *Id.* ¶ 64. Accordingly, the court affirmed the trial court's denial of the defendant's motion for directed verdict on the issue of proximate causation.

¶ 21   Our appellate court reached this conclusion in *Perkey* even though Dr. Lowy testified that: (1) Perkey's treatment in February 2001 would have been the same as it was in 2002,

[5]At one point in her testimony, Dr. Pfister testified that Dr. LeMay's failure to diagnose Tina's cervical cancer on June 23, 2000, caused Tina's chances for survival to decrease from between "58-63 percent" (assuming the cancer was "at Stage 2" at that time) to 32%. However, Dr. Pfister testified that Tina could not have had Stage 2A cancer (which carries a survival rate of 63%) on June 23, 2000, because Dr. LeMay did not observe a tumor extending down into the vagina from the cervix at that time, and Dr. Raime did not observe any such tumor in September 2000. Thus, based on Dr. Pfister's own testimony, if Tina's cancer had reached Stage 2 in June 2000, it must have been at Stage 2B, which carries a survival rate of 58%. Accordingly, Dr. Pfister's testimony suggests that if Tina had Stage 2 cancer in June 2000, Dr. LeMay's negligent failure to diagnose her cancer at that time cost Tina a 26% chance at survival. We arrive at this figure by calculating the difference between 58% (the chances of surviving Stage 2B cervical cancer) and 32% (the chances of surviving Stage 3B cervical cancer).

when her cancer was discovered (*id.* ¶ 18); (2) the survival rate from pancreatic cancer is poor, with about 23% of patients living 12 months after diagnosis and only 5% alive after 5 years (*id.* ¶¶ 22, 65); (3) although pancreatic cancer is curable in some cases (*id.* ¶ 23), it is most often diagnosed after the disease has metastasized, generally precluding any hope for a cure (*id.* ¶¶ 22, 65); and (4) if Perkey had pancreatic cancer in February 2001, which Dr. Lowy believed she did, there was greater than a 50% likelihood that it had already metastasized, and "even if she had been treated at that time, it was more likely than not that she would have died from the disease" (*id.* ¶ 22). Our appellate court held that these admissions by Dr. Lowy did not entitle the defendants to a directed verdict, reasoning:

> "[U]nder *Holton*, plaintiff was not required to prove that [Perkey] would have had a greater than 50% chance of survival or recovery absent the alleged malpractice. *Holton*, 176 Ill. 2d at 119. Rather, plaintiff had to present *some* evidence that the alleged negligence proximately caused the increased risk of harm or lost chance of recovery to a reasonable degree of medical certainty (*id.*), and plaintiff did so through Dr. Lowy's testimony that [Perkey] was two to six times more likely to survive five years (and thereafter live to a natural death) had she been diagnosed in February 2001 as opposed to July 2002." (Emphasis added.) *Id.* ¶ 65.

¶ 22  Dr. Pfister presented exactly the same type of expert testimony in this case. As noted, Dr. Pfister opined to a reasonable degree of medical certainty that, when Dr. LeMay examined Tina on June 23, 2000, Tina's cancer was either at Stage 1 (which has a survival rate of 80% to 90%) or at Stage 2B (which has a survival rate of 58%). Dr. Pfister also testified that, by the time Tina was diagnosed with Stage 3B cervical cancer in December 2000, her five-year survival rate had dropped to 32%, which represents a 26% to 58% reduction of her chance to survive the disease. Like the court in *Perkey*, we hold that this type of testimony, standing alone, is sufficient to establish a *prima facie* case of proximate causation under a lost chance of recovery theory, and is therefore sufficient to withstand a motion for directed verdict on the issue of causation.

¶ 23  The defendants argue that Hemminger's causation evidence was speculative and inadequate because Dr. Pfister "was unable to opine that the outcome in [Tina's] specific case would have been different with earlier treatment." We disagree. In *Holton*, our supreme court made clear that the plaintiff is not required to prove that " 'a better result would have been achieved absent the alleged negligence of the doctor.' " *Holton*, 176 Ill. 2d at 106 (quoting *Borowski*, 60 Ill. 2d at 424). Thus, Hemminger was not required to show that Dr. LeMay's negligence actually deprived Tina of a better *outcome*. Rather, he only needed to show that the alleged negligence "increased [a] *risk* of harm or [a] lost chance of recovery." (Emphasis added.) *Id.* at 119. In other words, Hemminger only needed to show that Dr. LeMay's negligence deprived Tina of the opportunity to undergo treatment that *could* have been more effective if given earlier, not that such treatment *would* have been effective. See, *e.g.*, *Walton v. Dirkes*, 388 Ill. App. 3d 58, 61 (2009) (plaintiff may survive a motion for directed verdict by presenting evidence that an earlier diagnosis would have led to treatment that "*may* have contributed to the [plaintiff's] recovery" (emphasis added and internal quotation marks omitted)); *Topp v. Logan*, 197 Ill. App. 3d 285, 299-300 (1990) (plaintiff must present evidence that earlier diagnosis *could* have altered final result); see also *Wodziak v. Kash*, 278 Ill. App. 3d 901, 913 (1996). Under *Holton*, Hemminger only had to show a lost

*chance* of survival, not that Tina actually would have survived absent Dr. LeMay's negligence. *Holton*, 176 Ill. 2d at 106-07, 110-19.

¶ 24    Here, Hemminger presented sufficient evidence to survive a motion for directed verdict. Dr. Pfister testified that the course of treatment for Tina's cancer (*i.e.*, chemotherapy and radiation) would have been the same whether Tina's cancer was diagnosed in June or December of 2000, and that her chances for surviving would have been better had this treatment started in June 2000. Put another way, Dr. Pfister's testimony pointed to specific treatment procedures (*i.e.*, radiation and chemotherapy) that were delayed by Dr. Lemay's negligent failure to diagnose Tina's cancer in June 2000, thereby increasing the risk of death and decreasing Tina's chances of survival.[6] That is sufficient to establish a *prima facie* case of causation under *Holton* and to withstand a motion for directed verdict. See, *e.g.*, *Perkey*, 2013 IL App (2d) 120470, ¶¶ 64-65; see generally *Walton*, 388 Ill. App. 3d at 67-68; *Johnson v. Loyola University Medical Center*, 384 Ill. App. 3d 115, 122-24 (2008).

¶ 25    The defendant argues that a directed verdict was proper in this case because Dr. Pfister failed to connect the survival rate statistics to Tina's particular case, thereby leaving a fatal gap in Hemminger's causation evidence. We disagree. Dr. Pfister expressly connected the survival rate statistics to Tina's case by opining that Dr. LeMay's negligent failure to diagnose Tina's cervical cancer in June 2000 caused Tina's chances for survival to decrease. Dr. Pfister based this opinion on the American Cancer Society's survival rate tables and on her professional experience, knowledge, and training. Dr. Pfister did not merely cite a table of aggregate survival rates for a general population; rather, she relied on that type of information and on her own training and experience in offering an opinion on *Tina's* diminished chance for survival. It was appropriate for Dr. Pfister to base her causation opinion, in part, on survival rate statistics. See *Perkey*, 2013 IL App (2d) 120470, ¶¶ 64-65. When viewed in the aspect most favorable to Hemminger, Dr. Pfister's opinion established a *prima facie* case of proximate causation and was therefore sufficient to forestall a motion for directed verdict. See *Perkey*, 2013 IL App (2d) 120470, ¶¶ 64-65.

¶ 26    We recognize that our holding is arguably in tension with *Ayala v. Murad*, 367 Ill. App. 3d 591 (2006), a case upon which the defendants rely. In *Ayala*, the plaintiff's decedent (Michelle) died of metastatic ovarian cancer. Michelle's mother, as special administrator of Michelle's estate, sued Michelle's former pathologist, alleging that his deviation from the standard of care delayed the start of Michelle's treatment and resulted in a decreased chance of survival. Before trial, the trial court granted the defendant's motion *in limine* barring the plaintiff's medical expert from testifying "as to what the course of treatment would have been for Michelle and how she might have done had she received treatment sooner." *Id.* at 595. During his trial testimony, the plaintiff's expert relied upon FIGO survival rate statistics to support his causation opinion. *Id.* at 602. Specifically, the expert testified to a reasonable degree of medical certainty that Michelle most likely had a Stage 1A tumor in April 1998, which, according to the FIGO statistics, had a survival rate of 80%, and that by September

---

[6]That arguably distinguishes this case from cases in which our appellate court held that a directed verdict for the defendant was proper, such as *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 408 (2000), and *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997). However, to the extent that these cases are in tension with *Perkey* and our holding in this case, we decline to follow them.

1999 (when Michelle's cancer was finally diagnosed), her cancer had reached Stage 4, which had a survival rate of less than 10%. *Id.* After the close of the plaintiff's case-in-chief, the trial court granted a directed verdict for the defendants. On appeal, our appellate court agreed that the plaintiff's evidence was insufficient as a matter of law. *Id.* Our appellate court held that the plaintiff's expert "could only testify in general terms about the FIGO staging system as he was not allowed, based upon the trial court's ruling on defendants' motion *in limine*, to testify as to what the course of treatment for Michelle would have been, and how she might have done had she received treatment sooner, and to connect the FIGO statistics to Michelle's case." *Id.* Accordingly, our appellate court concluded that the trial court's motion *in limine* prejudiced the plaintiff because it precluded her expert from showing that the defendant's alleged deviation from the standard of care proximately caused Michelle's injuries, and it remanded for a new trial. *Id.*

¶ 27    This case is arguably distinguishable from *Ayala* because, unlike the expert in *Ayala*, Dr. Pfister opined that *Tina's* chances of survival dropped by the percentages listed in the survival rate statistics, whereas the expert in *Ayala* merely staged Michelle's cancer at various time periods and listed the survival rates associated with those stages. Although the expert in *Ayala* testified in general terms that the defendant's delay in treating Michelle's cancer "substantially reduced [Michelle's] chances of surviving her cancer," reduced her life expectancy, and lessened the effectiveness of treatment, due to the trial court's motion *in limine* he was unable to tie the FIGO survival rate statistics to Michelle's case with the degree of specificity that Dr. Pfister did in this case. In any event, to the extent that our holding conflicts with *Ayala*, we decline to follow it. We find the court's reasoning in *Perkey* to be more sound and more persuasive.

¶ 28    In challenging the legal sufficiency of Dr. Pfister's causation opinion, the defendants also point to several concessions made by Dr. Pfister. For example, Dr. Pfister acknowledged that certain factors particular to an individual's cancer (such as the cancer's histological characteristics, its degree of differentiation, its responsiveness to treatment, and whether the cancer is exophytic or endophytic) may impact that individual's survival rate, but she conceded that she lacked the expertise to testify about the effect of any of these factors in Tina's case. In addition, Dr. Pfister agreed with the American Cancer Society's statement that its survival rate tables "cannot predict what will happen in any particular person's case." Moreover, Dr. Pfister conceded that cancer grows at different rates in different people, and that there is no way to tell how fast it will grow in any particular patient. The defendant's argue that these concessions entitled them to a directed verdict on the issue of causation.

¶ 29    We disagree. Although the concessions made by Dr. Pfister might affect the *weight* that the jury might choose to assign to her causation opinion, they do not render Dr. Pfister's opinion insufficient to establish proximate causation as a matter of law. The jury should have been allowed to consider and weigh all of the evidence, including Dr. Pfister's opinion. It is the jury's province to weigh the evidence presented at trial. As noted above, a directed verdict is inappropriate when the plaintiff has presented *some* evidence in support of each essential element of his or her claim. *Perkey*, 2013 IL App (2d) 120470, ¶ 63; *Davis*, 405 Ill. App. 3d at 31. In ruling on a motion for a directed verdict, a trial court may not weigh the evidence, and it must consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. *Maple*, 151 Ill. 2d at 453. When Dr. Pfister's

testimony is considered in the light most favorable to Hemminger, it provides evidence of causation sufficient to withstand a directed verdict.

¶ 30    The defendants also call into question Dr. Pfister's expertise and her competence to render a causation opinion in this case. For example, the defendants note that Dr. Pfister was not a gynecological oncologist and that she had encountered only a "few" patients with cervical cancer in her practice. However, these considerations merely affect the weight of Dr. Pfister's opinion; they do not render her opinion deficient as a matter of law. See *Moller v. Lipov*, 368 Ill. App. 3d 333, 344 (2006) ("The basis for an expert's opinion goes to the weight of the evidence, not to its sufficiency, and the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion."); see also *Snelson v. Kamm*, 204 Ill. 2d 1, 26-27 (2003). In any event, the defendants may not challenge Dr. Pfister's qualifications or the foundation for her causation opinion in this appeal because they have not cross-appealed the trial court's decision to allow Dr. Pfister to offer a causation opinion.[7]

¶ 31    In sum, we conclude that Hemminger presented enough evidence to create a triable issue of fact on the issue of proximate causation. Taking the evidence in the light most favorable to Hemminger, as we must, we cannot conclude that his causation evidence failed as a matter of law. The defendants' criticisms of Dr. Pfister's causation opinion merely go to the *weight* that the jury might ultimately assign to that opinion. The jury should not have been prevented from considering the evidence and deciding the issue of causation.

¶ 32    After we filed our opinion in this appeal, the defendants filed a petition for rehearing in which they argued that: (1) because this court relied on *Perkey*, a case which was decided after oral argument in this case, "[f]airness and a just result require" that we grant rehearing so that the parties may be permitted to address *Perkey* and its application to this case; (2) *Perkey* misstated and "diluted" the standard for establishing proximate causation under the lost chance of recovery theory as set forth by our supreme court in *Holton*; and (3) *Perkey* is distinguishable from this case because, unlike Dr. Pfister, the expert in *Perkey* testified as to "specific treatment procedures" that the plaintiff received which would have been the same if her cancer had been discovered earlier. We disagree.

¶ 33    As an initial matter, the defendants have filed a 14-page petition for rehearing that is devoted almost entirely to *Perkey*. In their petition, the defendants explain at length why they believe *Perkey* was wrongly decided and why they believe *Perkey* is distinguishable from this case. They argue extensively that *Perkey* should not govern our analysis. Thus, the defendants have already had ample opportunity to raise and develop their arguments regarding *Perkey*. Further briefing on this issue is unnecessary.

¶ 34    After carefully considering the defendants' new arguments regarding *Perkey*, we adhere to our initial opinion. Contrary to the defendants' assertion, neither *Perkey* nor our opinion in this case misstated or misapplied the *Holton* standard for establishing proximate cause. As

---

[7]The defendants also suggest that Dr. Pfister's causation opinion was flawed because she gave a range of possible stages for Tina's cancer in June 2000 and was unable to stage Tina's cancer precisely at that time. However, we have allowed similar testimony regarding cancer staging and have held that such testimony may be used to defeat a motion for directed verdict on the issue of causation in cancer cases. See, *e.g.*, *Perkey*, 2013 IL App (2d) 120470, ¶¶ 64-65; see also *Moller*, 368 Ill. App. 3d at 338, 343-44.

the defendants acknowledge, our opinion "correctly states the standard for establishing the proximate cause element of a claim under a 'lost chance' theory of recovery." Specifically, our opinion explicitly notes that "[t]o establish proximate causation, a plaintiff must prove that the defendant's negligence ' "more probably than not" ' caused the plaintiff's injury." *Supra* ¶ 15 (quoting *Holton*, 176 Ill. 2d at 107). We subsequently cited *Perkey* and *Davis* for the proposition that "[a] plaintiff establishes a *prima facie* case by presenting *some* evidence on every essential element of the cause of action. (Emphasis added.)" (Internal quotation marks omitted.) *Supra* ¶ 17. That statement (which did not originate in *Perkey*) is also a correct statement of the law, and it does not in any way contradict the causation standard announced in *Holton*. As the defendants correctly note, "the appropriate question *** is whether plaintiff presented *some* expert testimony from which the jury could conclude that is more probably true than not that defendant's negligence cost [the plaintiff] a chance for a better result" (emphasis added) (*Krivanec v. Abramowitz*, 366 Ill. App. 3d 350, 357 (2006)). That is exactly the standard that we applied in this case and that our appellate court applied in *Perkey*. As discussed above, we hold that Dr. Pfister's expert opinion satisfied this standard.[8] Moreover, we disagree with the defendants' argument that *Perkey* is distinguishable from this case in any material respect. The remaining arguments the defendants raise in their petition were adequately addressed in our initial opinion. We therefore deny the defendants' petition for rehearing.

¶ 35                                        CONCLUSION

¶ 36    For the foregoing reasons, we reverse the judgment of the circuit court of Whiteside County and remand for a new trial.

¶ 37    Reversed; cause remanded.

---

[8]We disagree with the defendants' suggestion that, in order for an expert's opinion to satisfy *Holton*'s causation standard, there "must be a statement by the expert that a preponderance of the evidence shows that the alleged negligence proximately caused an increased risk of harm or lost chance of recovery." An expert need only offer her opinion based on a "reasonable degree of medical certainty." *Witherell v. Weimer*, 118 Ill. 2d 321, 337 (1987). She need not state, in addition, that her causation opinion is based on the preponderance of the evidence. See *id*. ("An expert opinion held to a reasonable degree of medical certainty obviously furnishes an adequate basis for a jury's finding that causation was proved by a preponderance of the evidence."). It is for the *jury* to determine whether the expert's opinion establishes causation by a preponderance of the evidence after it weighs the expert's opinion against all the other evidence in the case.