2021 IL App (2d) 200353-U
No. 2-20-0353
Order filed June 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| DEANNA D. WILLIAMS, as Mother and Guardian of NATHAN A. CLEMENTS, a disabled adult, | ) ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 16-L-162 |
| ROCKFORD HEALTH PHYSICIANS, and RAYMOND A. DAVIS, M.D., | ) ) ) ) | Honorable Donna R. Honzel, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court erred in granting judgment notwithstanding the verdict where plaintiff's experts in pediatrics and pediatric surgery established to a reasonable degree of medical certainty that defendant doctor's negligence proximately injured her son. Accordingly, we reverse the trial court's order granting defendants' posttrial motion for judgment notwithstanding the verdict and reinstate the jury's verdict.

¶ 2   The question in this medical malpractice case is whether plaintiff presented enough evidence to demonstrate a causal connection tying defendant pediatrician's alleged breach of the standard of care and Nathan Clements' inborn disorder going undiagnosed for more than 15 years,

such that he unnecessarily suffered from chronic constipation and required a colostomy, rather than the definitive treatment for the disorder, a pull-through procedure. After a jury returned a verdict in plaintiff's favor, the trial judge entered a judgment notwithstanding the verdict, reasoning there was a fatal gap in plaintiff's causation evidence and there was inadequate evidence of proximate cause from a "lost chance" of effective treatment perspective. We reverse the trial judge's order and reinstate the jury's verdict.

¶ 3                                    I. BACKGROUND

¶ 4      Nathan Clements was born in 1997 with Hirschsprung's disease,[1] which is a congenital condition (meaning present at birth) that affects the large intestine and causes chronic constipation. He also has Down syndrome. Although most patients with Hirschsprung's disease are diagnosed within the first few months of life, Nathan was diagnosed when he was 16 years old. Nathan was diagnosed after his longtime pediatrician, defendant Dr. Raymond Davis, referred him to Dr. Glendon Burress, a pediatric gastroenterologist, for an evaluation for his chronic constipation. Dr. Burress immediately coordinated a biopsy, which was performed by pediatric surgeon Dr. Kristine Thayer, the result of which confirmed Nathan had Hirschsprung's disease. Nathan was eventually referred to Dr. Casey Calkins, a pediatric surgeon, who performed a colostomy that alleviated Nathan's chronic constipation and substantially improved his quality of life.

¶ 5      Deanna D. Williams, as Nathan's mother and guardian, filed a medical malpractice action

---

[1] Defendants disputed at trial that Nathan has Hirschsprung's disease. However, we presume that Nathan has Hirschsprung's disease, because the trial court had to accept as true the evidence supportive of the diagnosis for purposes of defendants' motion for judgment notwithstanding the verdict.

against Dr. Davis and Rockford Health Physicians (defendants), alleging Dr. Davis was negligent in failing to refer Nathan earlier to a pediatric gastroenterologist or surgeon for an evaluation of his ongoing constipation, and that this failure was the proximate cause of Nathan's Hirschsprung's disease going undiagnosed, years of painful constipation, and ultimately, his need for a colostomy. In plaintiff's view, had Dr. Davis referred Nathan to a pediatric gastroenterologist at his two-year-old pediatric office visit, he would have inevitably been sent to a surgeon who would have confirmed the diagnosis of Hirschsprung's disease and operated on him.

¶ 6       A jury trial was held over the course of several days in December 2019.  Deanna testified that Dr. Davis was Nathan's pediatrician from his birth in June 1997 until 2013.  Nathan was approximately two weeks old the first time he became constipated.  She contacted Dr. Davis, who instructed her to give Nathan a pediatric enema.  During the first year of life, Nathan did not have normal bowel movements, and feeding him breastmilk did not help.  Prior to late 1998, when Deanna and her family moved to Minnesota, she regularly brought Nathan to Dr. Davis for care. During that time, she could not remember a time when Nathan was able to go to the bathroom without help.  If she could not administer an enema, she would use the tip of it to try and stimulate the area so that Nathan would stool, and Nathan was often given prescription laxatives that she would mix with Nathan's juice.

¶ 7       Deanna further testified that, after they moved to Minnesota, she continued to bring Nathan to Dr. Davis because she trusted him.  She could not recall Dr. Davis saying anything to her about a pediatric gastroenterologist at that time, and Nathan continued to have frequent problems with constipation.  She continued to give Nathan enemas, suppositories, and various prescriptions for constipation.  In June 2002, the family moved back to Illinois.  When Nathan started kindergarten, he continued to be frequently constipated, and she continued to administer enemas and

suppositories. "It was our life." Nathan always needed help going to the bathroom, and she always helped him. At the time, she did not believe that anything else could be done to help relieve Nathan's constipation, and she assumed it was part of Down syndrome.

¶ 8      Deanna eventually began administering adult enemas on Nathan, but there were times when even those were not effective. After Nathan turned five years old, she gave Nathan enemas less frequently because he would fight her. She ceased giving him enemas by the time he was 15 years old because they made him angry and physically combative. She frequently received calls from Nathan's school reporting an odor, and she would notice that a fecal smell was coming from the pores of his skin. Nathan's stomach was often enlarged, which would make him angry. Around that time, Dr. Davis instructed her to give Nathan GoLYTELY, which is typically given to patients before colonoscopies. GoLYTELY was effective and seemed to give Nathan temporary relief. She also continued to give him MiraLAX, but the odor of feces occasionally came back. At that time, she would take him out of school for a week to give him four doses of MiraLAX to "clean him out."

¶ 9      Deanna further testified that Nathan was seen by a gastroenterologist in 2013. That occurred after she was asked by her coworkers who Nathan's gastroenterologist was, but she did not know that word. In May 2013, at Nathan's last office visit with Dr. Davis, she insisted that Dr. Davis refer Nathan to a gastroenterologist. He agreed and referred Nathan to Dr. Glendon Burress. At her first meeting with Dr. Burress, he explained Hirschsprung's disease to her for the first time, and he told her that Nathan probably had it and he was going to do a biopsy. Nathan eventually ended up in the care of Dr. Calkins, who performed several surgeries on him, including a colostomy. Immediately after that procedure, she noticed that Nathan was noticeably happier and more affectionate, and she no longer needed to give him full doses of MiraLAX.

¶ 10                                   Dr. Hackell

¶ 11     Dr. Jesse Hackell testified as plaintiff's expert pediatrician regarding the standard of care. He had practiced as a general pediatrician for 38 years. His office was a community-based pediatric office, and his patients ranged in age from newborn to college-age. In addition to treating common conditions, like colds and ear infections, he makes referrals to specialists "for children with more complex symptoms that we may not be able to care for ourselves." He was aware of Hirschsprung's disease because it is one of many conditions in children that he learned about during his training. Hirschsprung's disease is an anatomic abnormality that is always present, although the constipation associated with it is not necessarily always present. He had seen about six patients with Hirschsprung's disease during his career. Of those patients, most were diagnosed within the first six to nine months of life, but none of them had Down syndrome. As a pediatrician, he does not "actually make the diagnosis of Hirschsprung," but he "might suspect it as one of the conditions [he is] thinking about in a child presenting with various symptoms."

¶ 12     In preparation for his testimony, Dr. Hackell reviewed Dr. Davis' medical records on Nathan going back to his birth, and they reflected ongoing problems with bowel movements and constipation. He detailed much of Nathan's relevant medical history at trial. Specifically, Dr. Hackell testified that, from the time Nathan was born until he was six months old, he had "fairly normal stooling patterns." Beginning at six months of age, Nathan was often constipated for prolonged periods of time. For example, at his six-month office visit, Nathan was constipated, presented with abdominal pain, and had foul-smelling gas. Dr. Hackell testified that a breast-fed baby of that age should never be constipated to the point of pain. At seven months, Nathan's mother called Dr. Davis' office to report constipation, and Dr. Davis' notes stated, "constipated times three months," and "enema one time per week." Dr. Hackell opined that an infant should

not need enemas. When Nathan was nine months old, Nathan was constipated and was being given daily enemas, as well as laxatives. At 11 months, Dr. Davis' notes reflected that Nathan continued to have constipation, nothing seemed to help, and Nathan was often straining. Dr. Hackell testified that this was not a normal finding for an 11-month-old child. Nathan continued to receive laxatives, and Dr. Davis instructed Nathan's mother to administer further pediatric enemas and follow up with his office.

¶ 13    Dr. Hackell testified that, at Nathan's one-year visit, Dr. Davis' notes suggested that Nathan's constipation had improved somewhat. Nathan's mother reported that he was having bowel movements every other day, and he had not been given laxatives for three weeks. However, Dr. Hackell noted that Nathan's stools were still hard, and that was concerning because hard stooling had "been persistent for a long time." At 15 months, Nathan was again constipated and was being given laxatives, and Dr. Davis advised Nathan's mother to administer pediatric enemas as needed. At Nathan's 18-month examination, Nathan's mother told Dr. Davis her concerns about constipation, and Dr. Davis' notes reflected that he could feel palpable stool through Nathan's abdominal wall, which Dr. Hackell testified was abnormal because it suggested "that there's a large amount of stool there" that should have already left the body.

¶ 14    Nathan's two-year checkup with Dr. Davis was on July 22, 1999. The intake interview reflected that his mother still had concerns about constipation and that Nathan was being given enemas as needed. Dr. Hackell opined that, at the two-year visit, the continued use of enemas should "absolutely" raise concerns for a reasonably careful pediatrician. He opined that the repeated use of enemas on a child is "cruel [and] something that should not be necessary," and it should have suggested that there was "something going on that's not allowing the child to have normal bowel movements."

¶ 15    Dr. Hackell testified that if a child has problems with chronic constipation up to his two-year-old office visit, particularly when the child has Down syndrome, the standard of care requires the pediatrician to consider Hirschsprung's disease, among other possible causes, because there is an association between Hirschsprung's disease and Down syndrome.  He explained that when a child with chronic constipation is evaluated by a reasonably careful pediatrician, "the pediatrician has to perform a differential diagnosis," which he explained "includes a list of the potential causes of that symptom[,] and it provides *** almost a checklist of things that might be causing" the symptom.  As the possible causes of the symptom are investigated, the pediatrician "can tick those off as being more or less likely or ruling them in or ruling them out."  He testified that pediatricians can either diagnose or rule out some of the possible causes included in their differential diagnosis, but for other possible causes, the pediatrician must make a referral to a specialist.  Dr. Hackell testified that, in a case like Nathan's, where the child has Down syndrome and chronic constipation, Hirschsprung's disease should be "significantly high" on the differential diagnosis of a reasonably careful pediatrician, again, because of the known association between the two.  The pediatrician "should have the child worked up for" Hirschsprung's disease.  He clarified that, although the standard of care does not require the pediatrician to actually diagnose Hirschsprung's disease, it requires the pediatrician to consider it.

¶ 16    Dr. Hackell opined that Dr. Davis deviated from the standard of care at Nathan's two-year-old checkup because he did not refer Nathan to a pediatric gastroenterologist to diagnose the cause of the chronic constipation.  Pediatricians "don't do the testing to make a specific diagnosis" and, in Nathan's case, referral to a pediatric gastroenterologist was needed "to elucidate the reasons that [the chronic constipation] was so troubling and so persistent and come up with an actual diagnosis."  He explained that constipation is not a diagnosis, but rather, it is a symptom.  "It

doesn't tell you why it's occurring. And there are a whole bunch of reasons that [chronic constipation] is occurring. And when you have a symptom that's persistent, you need a diagnosis." With a diagnosis, "you can have a specific treatment rather than just [continue to give] enemas and laxatives and mineral oil to try and relieve symptoms." Dr. Hackell opined that up to Nathan's two-year-old office visit, Dr. Davis' treatment of Nathan was within the standard of care.

¶ 17    Dr. Hackell testified that he had referred hundreds of patients to pediatric gastroenterologists over his career. When he makes such a referral, he expects to receive a letter or report "to complete [his] record of the evaluation of what the gastroenterologist found." In a case like Nathan's, from his perspective as a pediatrician, *he would expect the workup performed by a pediatric gastroenterologist to include a workup for Hirschsprung's disease.*[2] The court barred questions about what the gastroenterologist would actually do. When questioned whether it would have been appropriate to refer Nathan to any other type of specialist, Dr. Hackell testified that he "would start with a gastroenterologist at this point. This doesn't look like something that needs a surgical evaluation as much as it needs an evaluation of constipation. And a gastroenterologist—a pediatric gastroenterologist, is the one who would do that."

¶ 18    Dr. Hackell acknowledged that Dr. Davis' notes from Nathan's two-year-old office visit stated, "refer to peds GI," but that notation did not meet the standard of care because it did not

_____

[2] We emphasize this statement because, in granting defendants' posttrial motion for judgment notwithstanding the verdict, the court stated that it should have sustained defendants' trial objection and stricken Dr. Hackell's testimony concerning his expectation of what a pediatric gastroenterologist would do because it lacked foundation and invited speculation.

"specify the timeframe for the referral nor [did] it specify the person being referred to." Moreover, there was no indication of a referral in the referral section of the notes, and Dr. Hackell found no referral form or the name of any pediatric gastroenterologist in Nathan's medical records up to that point. He could not say whether a referral was made at that point, but if a referral was made, "there was no follow-up to see what the results of it were." Dr. Hackell stated, "either a referral was not made, or it was made [but] it was not followed up to see what the results were," both of which fell below the standard of care.

¶ 19    Dr. Hackell further testified that Dr. Davis continued to deviate from the standard of care at each of Nathan's office visits through 2013 by not referring him to a pediatric gastroenterologist to determine the cause of his chronic constipation, with Hirschsprung's disease significantly high on the differential diagnosis. Dr. Hackell acknowledged that after Nathan's two-year-old office visit, Nathan did not see Dr. Davis for approximately three years, in part, because of plaintiff's move to Minnesota. Nathan thereafter saw Dr. Davis for his five-year-old office visit in August 2002, after plaintiff returned to Illinois. At that appointment, Dr. Davis noted that Nathan's bowel movements were "okay," and plaintiff did not mention any concerns with constipation. Dr. Davis' notes reflected that, when Nathan was nearly six years old, Nathan was "holding by his tailbone and [did] not want to squat," constipated, and had "no bowel movement times nine days." Nathan was prescribed laxatives, and Dr. Davis' records reflected the continued frequent use of laxatives. At an office visit when Nathan was 7, Nathan had increased constipation, and stool could be felt through his belly. Dr. Davis recommended increasing the use of laxatives to twice per day and using Fleet, which is an enema. At his 8-year-old visit, Dr. Davis' notes reflected that Nathan's bowel movements continued to be irregular, and he was given laxatives daily.

¶ 20    At office visits when Nathan was 9 and 10, Dr. Davis' notes reflected that Nathan had a good appetite and was having small, daily bowel movements, although he continued to take laxatives two or three times per week, or as needed.

¶ 21    One month after Nathan's fifteenth birthday, Dr. Davis noted that Nathan still had problems with constipation and had not "gone in two weeks, and when he goes, he just lays in bed with a Pull-Up on and will shake." The medical records showed the continued use of MiraLAX and GoLYTELY, but neither helped. Dr. Davis also noted dysfunctional urination, which Dr. Hackell stated should have indicated "something unusual with [Nathan's] bladder function." Nathan was also x-rayed at this visit, the results of which showed a large amount of stool filling the rectum and extending *** [to] the upper left side of the abdomen." Dr. Hackell noted that Dr. Davis ordered a large quantity of GoLYTELY for Nathan, but Dr. Hackell did not believe it would have helped much based on the x-rays. He reiterated that, based on those findings and x-rays, in 2012, just as in 1999, the standard of care required Dr. Davis to refer Nathan to a pediatric gastroenterologist.

¶ 22    On May 15, 2013, approximately one month before his sixteenth birthday, Nathan returned to Dr. Davis. His mother noted further complaints of constipation, and Nathan was holding his lower back. Nathan's mother also reported that Nathan frequently had smears of stool in his Pull-Ups which, in Dr. Hackell's view, suggested that the intestine was blocked with a large amount of hard stool, and newly formed stool was leaking around the blockage. Dr. Davis' notes stated that Nathan had "chronic constipation all of his life." At this appointment, Dr. Davis made a referral to a pediatric gastroenterologist. Dr. Davis also discussed with Nathan's mother increasing Nathan's dosage of Senna, which is a laxative.

¶ 23    Dr. Hackell testified that Dr. Burress, a gastroenterologist, examined Nathan in July 2013, and the results of his workup were sent to Dr. Davis. Hirschsprung's disease was part of Dr.

Burress' differential diagnosis. Dr. Hackell could not recall what test Dr. Burress ordered, but the notes indicated that Dr. Burress would attempt to coordinate a suction biopsy, which sounded reasonable to Dr. Hackell. Dr. Hackell's understanding was that, at that point, the cause of Nathan's chronic constipation was diagnosed as Hirschsprung's disease.

¶ 24                                Dr. Ehrlich

¶ 25    Dr. Peter Ehrlich testified as plaintiff's expert regarding causation. Dr. Ehrlich was a board-certified pediatric surgeon, and he was the co-director of the pediatric surgery in colorectal program at the University of Michigan. Hirschsprung's disease is one of the primary diseases he treats at his clinic. During his career, he had performed more than 200 surgeries to treat Hirschsprung's disease. Twelve of those patients had Down syndrome, like Nathan.

¶ 26    Dr. Ehrlich explained that Hirschsprung's disease is a congenital disorder that is most commonly diagnosed in newborns and young children. The main feature of the disease is the absence of ganglion cells, which he described as the "brains of the intestine." In those with the disease, the intestinal muscles stay contracted, which causes the individual to be constipated. In newborns, the disease presents itself when the child "has trouble going to the bathroom, passing poop, and [the newborn] becomes very distended." He stated that about 75% of those with Hirschsprung's disease are diagnosed within the first month of life and, beyond that, the diagnosis usually follows evaluation for chronic constipation. For children under three months of age, a suction biopsy can be used to diagnose Hirschsprung's disease. However, a full-thickness biopsy is necessary for children older than three months. He explained that a full-thickness biopsy is a 15-minute surgical biopsy performed under general anesthesia, wherein a portion of the colon is removed for testing. He explained that the intestine is made up of several layers, and ganglion cells are found in two of them. "[Y]ou have to make sure that you examine the places where the

ganglion cells are in, and you have to look at a certain number of slides to make sure that you don't *** sample the wrong place."

¶ 27    Dr. Ehrlich testified that, from his perspective as a pediatric colorectal surgeon, if a patient with Down syndrome and a history of chronic constipation was referred to a reasonably careful pediatric colorectal surgeon, that doctor would biopsy the child to determine if he or she had Hirschsprung's disease.  He testified that Down syndrome is a significant risk factor for Hirschsprung's disease, because five to ten percent of Down syndrome children have it.  "The first thing that you would do is *** make sure that that child didn't have Hirschsprung's disease," and the disease would be at the top of the differential diagnosis.  He noted that the differential diagnosis could also include functional constipation, which is diet-related, intestinal dysmotility problems, meaning the intestines are not functioning properly, strictures from diseases, meaning a narrowing of the intestines, inflammatory bowel disease, and thyroid issues.

¶ 28    Dr. Ehrlich testified that treatment for Hirschsprung's disease begins with ensuring that the child does not have any signs of infection.  He then shows the family how to help the child go to the bathroom using a "modified enema procedure where we wash the poop out."  Finally, he discusses with the child's family "the advantages of correcting this."  Dr. Ehrlich testified that the only treatment for Hirschsprung's disease is surgery; no medication can treat it.  "[Y]ou treat Hirschsprung's disease surgically no matter what."  The surgery to correct Hirschsprung's disease is a pull-through procedure, and it involves the removal of the segment of the colon that lacks ganglion cells, and the part of the intestine with ganglion cells is brought down and sewn to where the sphincter is.  A pull-through procedure can be performed two or three ways, depending on which method the surgeon is most comfortable with.  Dr. Ehrlich agreed that most children with severe constipation do not get surgery "because of the cause and the surgical cost."

¶ 29    Dr. Ehrlich reviewed Nathan's medical records, and he believed that Nathan had Hirschsprung's disease based on the biopsy performed in 2013 by Dr. Thayer, and he believed that Hirschsprung's disease was the cause of Nathan's chronic constipation.  Although Dr. Thayer was not convinced that Nathan had Hirschsprung's disease, Dr. Ehrlich disagreed because, in his view, the pathology report met the criteria for the disease.

¶ 30    Dr. Ehrlich also testified as to the treatment Nathan received.  Specifically, Nathan did not have a pull-through procedure.  Instead, he first had an appendicostomy, where the appendix is sewn to the belly and a tube is inserted, allowing the individual to receive enemas via that route, rather than by a traditional enema, which is more painful.  Dr. Ehrlich testified that Nathan ultimately had a second surgery, namely a colostomy, which "is like plumbing."  The surgery involves taking "a piece of the colon and instead of going down through your bottom, you bring it up to your skin, and you poop into—the common term is into a 'bag.' "  He explained that Nathan had this surgery because Dr. Calkins likely felt that he would do better with a colostomy because it was very difficult and painful for him to go to the bathroom.

¶ 31    Dr. Ehrlich testified that, because Nathan's biopsy at age 16 showed Hirschsprung's disease, a biopsy at age two would have likewise shown the disease because it is a congenital condition.  He opined that, had Nathan been worked up for Hirschsprung's disease when he was two years old, he would have been biopsied and, "[u]ltimately, he would have likely had an operation," likely a pull-through procedure, as opposed to the surgery that he ultimately received, a colostomy.  He could not say for sure whether Nathan would have had a one-stage or a two-stage pull-through procedure if he had been diagnosed at age two, because it "would depend on what a surgeon would do and how he would have been seen."  Dr. Ehrlich further testified that intervention when Nathan was two years old would have increased his chances of avoiding a

colostomy, enabled his colon to work better, and prevented years of constipation. He explained that "the longer that the colon is blocked, the more that it won't work." If Nathan were timely diagnosed, "it's more likely that he would have had a pull-through procedure than the operation he has ended up with now." Patients diagnosed and treated earlier generally have better outcomes than those who are diagnosed at age three or four. He stated that he could not quantify how intervention when Nathan was two years old would have increased his chances of avoiding a colostomy, but he stated that Nathan "would have had a much better chance at two than he did at 16," as well as a better chance at age six or seven than at 16.

¶ 32   Dr. Ehrlich agreed that the level of functioning in a child with Down syndrome can impact the success of the pull-through procedure. The data was unclear as to whether lower-functioning children with Down syndrome do not do as well as higher-functioning children with Down syndrome after having a pull-through procedure, but he stated that "I think you can make that assumption." It was "probably true" that lower-functioning children with Down syndrome are more likely to have persistent problems with constipation than higher-functioning children with Down syndrome, although he did not think that issue had been definitively studied. Bowel dysfunction, such as constipation or incontinence, is common for most patients that undergo a pull-through procedure. "[I]t's one of the reasons why we started this colorectal clinic—that we wanted to help and treat with that. That was our interest because these kids were failing when they got older." Dr. Ehrlich testified that, "[i]n general, 85 to 90 percent of kids will have social incontinence without a colostomy. And the thing is[,] these kids have a diagnosis."

¶ 33                                   Dr. Calkins

¶ 34   Plaintiff also presented the video-recorded deposition of Dr. Casey Calkins, the pediatric general and thoracic surgeon who twice operated on Nathan. He testified that he treats many types

of congenital anomalies in infants, children, and young adults. Most of his practice is dedicated to patients with colorectal disorders. Dr. Calkins testified that, although Hirschsprung's disease is rare, it is well-known within the medical community. He explained that the disease is the result of the abnormal development of the enteric nervous system, meaning "your gut, your intestinal tract from your mouth to your anus," which "has its own nervous system that's beyond your control." In Hirschsprung's disease patients, ganglion cells, which allow the intestinal tract to relax, do not develop normally. Most commonly, the very end of the gastrointestinal tract is affected, namely the colon. The part of the colon that lacks ganglion cells is in a constant state of spasm, "[a]nd so it's very, very difficult to poop."

¶ 35    Dr. Calkins explained that "the gold standard way" to diagnose Hirschsprung's disease is to biopsy the very end of the gastrointestinal tract, near the rectum. The biopsy is performed by a surgeon, who obtains the specimen and sends it to a pathologist to search for ganglion cells. Absence of ganglion cells, in addition to enlarged nerves that would ordinarily connect to the ganglion cells, means that the patient has Hirschsprung's disease. Most patients are diagnosed within the first weeks of life.

¶ 36    The definitive treatment for Hirschsprung's disease is a pull-through procedure, wherein the portion of the intestinal tract that lacks ganglion cells is removed, and the remaining healthy intestinal tract is pulled through and "replace[d] with bowel that does [contain ganglion cells]." No medicine can treat it. Surgery is the only treatment for Hirschsprung's disease, and any other treatment is temporizing. Patients with "really, really, really short segment [Hirschsprung's] disease" can be treated with Botox or other treatments, but those are not permanent solutions. The treatment for Hirschsprung's disease was the same in 1999, when Nathan was two, as it was at the time of trial.

¶ 37    Dr. Calkins testified that he treated Nathan for Hirschsprung's disease. Nathan was not a typical patient with Hirschsprung's disease because he first met him when Nathan was 17 years old, and it was uncommon for patients to be newly diagnosed at that age. A new diagnosis of Hirschsprung's disease after the patient is one year old is a "late diagnosis of the disorder." Nathan was also not a typical patient because of his cognitive problems, like Down syndrome. He would categorize Nathan as "very difficult and challenging to deal with." He explained that Nathan was "really nonverbal" and had autism. When he first met him, Nathan was very combative and difficult to examine, although he had since become easier to examine because Nathan was more familiar with him. Dr. Calkins made clear that he had not reviewed any of Nathan's medical records from his birth in 1997 through 2013, and he could offer no opinion as to whether Dr. Davis breached the standard of care. It was "largely irrelevant as to how [he] would care for [Nathan]."

¶ 38    Dr. Calkins did, however, testify concerning the care Nathan received just prior to coming to see him. Nathan came into his care after being seen by Dr. Sood, a pediatric gastroenterologist with an interest in motility disorders. Dr. Calkins testified that Nathan was initially thought to have a motility problem, but Dr. Sood suspected Hirschsprung's disease after examining Nathan and reviewing his medical records. Dr. Sood first performed an anorectal manometry, which is a test that evaluates how well the internal sphincter works. Although that test is "not the gold standard diagnosis" for Hirschsprung's disease, "it is one of the ways to make the diagnosis." The results of that procedure were suggestive of Hirschsprung's disease because the end portion of Nathan's colon did not contract. "[T]he appropriate term for that is sigmoid dysmotility." Although he could not say for certain, Nathan's sigmoid dysmotility could have been caused by years of chronic constipation. Dr. Sood elicited one of Dr. Calkins' partners to perform a Botox injection, which is "a temporizing measure *** to allow the internal anal sphincter to relax to see

if that would allow [Nathan] to stool." Dr. Calkins became involved in Nathan's care when the Botox injection did not work.

¶ 39 Dr. Calkins also noted that pediatric gastroenterologist Dr. Burress and pediatric surgeon Dr. Thayer were previously involved in Nathan's care. Nathan's medical records reflected that Dr. Thayer performed a rectal biopsy, as well as a strip myectomy, which he explained involves the removal of a portion of the internal anal sphincter in an effort to get it to relax so that stool may pass more easily. Nathan's medical records showed that the strip myectomy was complicated by a hematoma, or "bleeding in the space." It also caused a number of other complications during the procedure. To Dr. Calkins' knowledge, Nathan did not have any other surgical treatments prior to coming into his care.

¶ 40 Dr. Calkins explained that, in 2016, he had three surgical options to treat Nathan: (1) a colostomy; (2) an appendicocecostomy and sigmoid resection; or (3) a pull-through procedure. He told Nathan's mother that his first choice would be to perform a colostomy because it was the safest and easiest option for Nathan. His mother, however, was initially opposed to that option. He further explained that, to perform a pull-through procedure, Nathan would also need an "protective ostomy" which, again, Nathan's mother was initially opposed to, because she did not want Nathan to have an ostomy, wherein stool is passed into a bag located outside of the body. A pull-through procedure "wasn't really part of the equation." Further, with a pull-through procedure, Dr. Calkins feared complications could arise similar to when Dr. Thayer performed a strip myectomy that could render Nathan incontinent, and he was also concerned that Nathan lacked the functional ability to use the toilet on a daily basis.

¶ 41 Dr. Calkins performed two surgeries on Nathan. In April 2015, he performed an appendicocecostomy and sigmoid resection. The appendicocecostomy involved putting a catheter

in Nathan's colon to allow Nathan's mother to flush it out daily with saline. "It's like an enema from above," which was beneficial because Nathan was extremely difficult to treat with traditional enemas. The sigmoid resection involved "essentially taking the sigmoid colon, cutting it out, and then attaching the end of what was left of the colon to the rectum." He agreed that, to the extent that the sigmoid colon was not working properly, the procedure "removes it from the equation." Dr. Calkins explained that a sigmoid resection is not a pull-through procedure because it does not involve the removal of the rectum. Dr. Calkins performed this more limited, conservative surgery, which did not involve an ostomy, with the acknowledgment of Nathan's mother that it may not work. The first surgery was ultimately not successful because it did not "deal with the Hirschsprung['s disease]," and "you need somebody that can help do the flushes and a cooperative patient."

¶ 42    In February 2016, Dr. Calkins performed a second surgery on Nathan, namely a colostomy, the results of which causes his feces to collect into a bag. Dr. Calkins testified that this surgery was successful from the standpoint of Nathan's mother, because she relayed to him that she was very pleased with the outcome "compared to what she had been dealing with previously," and that the surgery had substantially improved Nathan's quality of life. During the second surgery, Dr. Calkins left the cecostomy tube (which was part of the first surgery) in place "just in case his colon wasn't working, and we needed to use that to flush things through." In July 2016, he removed Nathan's cecostomy tube because the colostomy was successful, and Nathan no longer needed it. Dr. Calkins continued to see Nathan, and he was still doing well following the colostomy. His pre-surgery and post-surgery diagnoses were both Hirschsprung's disease.

¶ 43    Dr. Calkins testified that, if Nathan had come into his care at age one or two, he would have diagnosed Hirschsprung's disease using a biopsy and performed a pull-through procedure.

When questioned whether he would have performed the procedure in one surgery or, more conservatively, over the course of two surgeries, he answered that it would have depended on many factors, such as Nathan's family and what their resources were, as well as his own experience as a surgeon. "If I was [*sic*] right out of training, I would probably be more conservative. If you asked me that same question today, *** I might do a primary operation where I did that all at one time." He agreed that, in a patient like Nathan, who presented more complex challenges, it would have been more likely that, when Nathan was two years old, he would have had the pull-through procedure over the course of two surgeries.

¶ 44    Dr. Calkins also testified generally regarding the expected outcomes of the pull-through procedure in children who have Down syndrome. Dr. Calkins agreed that it was fairly common for children to have some constipation immediately after having a pull-through procedure, but the constipation goes away for the majority of patients. He noted that, following a pull-through procedure, some Down syndrome children do not do as well as non-Down syndrome children. "[S]ome patients with Down syndrome that are severely disabled cognitively still present a challenge regardless of the techniques and making the diagnosis early." One of the most prevalent complications after a pull-through procedure for children with Down syndrome is constipation, for behavioral or biological reasons. He explained that sometimes, even if a pull-through procedure is performed early, the colon in a child with Down syndrome "just doesn't work very well" due to reasons the medical community does not yet understand. "Some patients do extraordinarily well with the same operation and some patients don't."

¶ 45                    Defendants' Motion for a Directed Verdict

¶ 46    At the close of plaintiff's case-in-chief, defendants filed a written motion for a directed verdict, arguing that plaintiff's case suffered from a fatal gap in the evidence necessary to establish

a causal connection between Nathan's injury and Dr. Davis' alleged negligent conduct in failing to refer him earlier to a pediatric gastroenterologist. Specifically, defendants pointed to Dr. Hackell's testimony that the standard of care required a reasonably careful pediatrician to refer Nathan to a pediatric gastroenterologist at his two-year-old office visit so that the cause of his chronic constipation could be worked up. Defendants asserted that because plaintiff did not call an expert pediatric gastroenterologist at trial, she presented no expert testimony concerning how a pediatric gastroenterologist would have evaluated Nathan or whether a pediatric gastroenterologist would have subsequently referred Nathan to a pediatric surgeon. Defendants stressed that the trial court concluded that Dr. Hackell lacked the necessary foundation to testify concerning what a reasonably careful pediatric gastroenterologist would have done if Nathan had been referred earlier. During the hearing on the motion, defendants noted that Dr. Ehrlich testified concerning what a reasonably careful pediatric surgeon would have done, but they asserted that plaintiff's evidence "essentially miss[ed] the middle step in plaintiffs' causation argument, and plaintiff can't say now that any alleged negligence of Dr. Davis would have led to any different outcome or that *** earlier surgical intervention would have been made." The trial court reserved its ruling on defendants' motion for a directed verdict, and defendants presented their case. At the end of trial, the court revisited the motion and denied it.

¶ 47    After defendants presented their case, the jury returned a verdict in favor of plaintiff.

¶ 48                    Defendants' Posttrial Motion and Ruling

¶ 49    On February 19, 2020, defendants filed a posttrial motion pursuant to section 2-1202(b) of the Illinois Code of Civil Procedure (Code) (725 ILCS 5/2-1202(b) (West 2018). They argued, pertinently, that the trial court should have granted their motion for a directed verdict at the close of plaintiff's case. Defendants recounted that plaintiff's expert pediatrician, Dr. Hackell, testified

that the standard of care required Dr. Davis to refer Nathan to a gastroenterologist at age two and at all subsequent appointments, and that plaintiff's expert pediatric surgeon, Dr. Ehrlich, testified that if Nathan were referred to a pediatric surgeon, he would have undergone a surgical biopsy to determine whether he had Hirschsprung's disease. In defendants' view, because there was no testimony that a reasonably careful pediatric gastroenterologist would have referred Nathan to a pediatric surgeon at any time prior to when Nathan was eventually referred just before he turned 16, plaintiff failed to establish that the lack of an earlier referral was the proximate cause of Nathan's injury.

¶ 50 The trial court granted defendants' posttrial motion, stating that it should have granted defendants' motion for a directed verdict at the close of plaintiff's evidence. In so ruling, it stated that plaintiff produced no evidence concerning proximate cause in two respects. First, plaintiff failed to call an expert pediatric gastroenterologist at trial and did not lay an adequate foundation for Dr. Hackell's testimony concerning what he would expect such a specialist to do upon earlier referral. In so ruling, the trial court concluded that it should have sustained defendants' objection to the question posed to Dr. Hackell concerning whether a reasonably careful pediatrician would expect a pediatric gastroenterologist to include Hirschsprung's disease in the specialist's "workup." Specifically, it ruled that "Dr. Hackell's 'expectation' of what that specialist would do was not supported by a proper foundation and *** invited speculation." The trial court reasoned:

"[w]ithout expert testimony as to what course of treatment a reasonably careful pediatric gastroenterologist would have provided for Nathan ***, there's no way to know at what point, if ever, that specialist would have made a referral to a surgeon. *** [I]t would be pure conjecture, speculation[,] and surmise to make any assumptions about how a pediatric gastroenterologist would choose to treat him. *** We don't have a pediatric

gastroenterologist's testimony, to a reasonable degree of medical certainty, saying what evaluation and management would have looked like for two year old Nathan or at any other age prior to the time Nathan was actually seen by a pediatric gastroenterologist[,] and certainly no evidence that [the] specialist would send this patient to the surgeon."

Second, from a lost-chance-of-effective-treatment perspective, proximate cause was lacking because no expert testified that an earlier diagnosis could have led to a pull-through procedure and, if so, that it would have prevented further constipation or obviated the need for a colostomy.

¶ 51    Plaintiff timely appealed.

¶ 52                                        II. ANALYSIS

¶ 53    Plaintiff argues that the trial court erred in granting defendants' posttrial motion for judgment notwithstanding the verdict because the absence of expert testimony from a pediatric gastroenterologist did not amount to a fatal gap in the proximate cause evidence connecting defendants' deviation from the standard of care to Nathan suffering years of constipation and ultimately requiring a colostomy.   Plaintiff contends that testimony from a pediatric gastroenterologist was unnecessary because Nathan's need for surgery was a foregone conclusion, as the evidence, when viewed in the light most favorable to plaintiff, demonstrated that (1) Nathan had Hirschsprung's disease, which is a congenital condition; and (2) the disease has no treatment other than surgery.   Further, Nathan's need for surgery was reinforced by what transpired as soon as Dr. Davis referred Nathan to a pediatric gastroenterologist in 2013—he was subsequently referred to a pediatric surgeon, Dr. Calkins, who operated on Nathan.   Plaintiff contends that the jury did not need to speculate concerning how a gastroenterologist would have treated Nathan had Dr. Davis referred him earlier, such that the jury's verdict should be reinstated.

¶ 54                    Admissibility of Dr. Hackell's Challenged Testimony

¶ 55    As a threshold matter, we address plaintiff's argument that the trial court erred in retroactively striking Dr. Hackell's testimony that he "would expect the workup by that pediatric gastroenterologist to include a workup for Hirschsprung['s disease]."  As noted, in granting defendants' motion for judgment notwithstanding the verdict, the trial court concluded that it should have sustained defendants' objection to the question posed to Dr. Hackell concerning whether a reasonably careful pediatrician would expect the workup by a pediatric gastroenterologist to include a workup for Hirschsprung's disease.  Again, in striking this question and answer, the trial court reasoned that "Dr. Hackell's 'expectation' of what that specialist would do was not supported by a proper foundation and *** invited speculation."

¶ 56    Plaintiff initially argues that defendants forfeited review of this issue by failing to raise it in their posttrial motion.  Plaintiff contends that defendants argued only generally that the evidence was insufficient, and defendants never specifically challenged the ruling on Dr. Hackell's testimony that ultimately became the basis for the trial court's determination that it should have entered a directed verdict in defendants' favor at the close of plaintiff's case-in-chief.  Defendants respond that their posttrial motion was replete with challenges to the admission of Dr. Hackell's testimony on this issue.

¶ 57    Section 2-1202 of the Code, under which defendants filed their motion for judgment notwithstanding the verdict, governs posttrial motions in jury trials.  It provides:

> "Relief desired after a trial in jury cases *** must be sought in a single posttrial motion.  Relief after trial may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury, even though no motion for directed verdict was made or if made was denied or ruling thereon reserved.  The posttrial motion must contain the points relied upon,

particularly specifying the grounds in support therefor, and must state the relief desired, as

for example, the entry of a judgment, the granting of a new trial or other appropriate relief."

735 ILCS 5/2-1202(b) (West 2018).

See also Illinois Supreme Court Rule 366(b)(2)(iii) (eff. Feb 1, 1994) ("A party may not urge as error on review of the ruling on the party's posttrial motion any point, ground, or relief not specified in the motion"). Indeed, all waivable issues that are not argued in the posttrial motion are forfeited for purposes of appellate review. *American National Bank and Trust Co. of Chicago v. J & G Restaurant, Inc.*, 94 Ill. App. 3d 318, 319 (1981).

¶ 58    We agree with defendants that they adequately specified their challenge to the trial court's initial admission of Dr. Hackell's testimony concerning his expectation that a workup by a gastroenterologist would include a workup for Hirschsprung's disease, such that defendants adequately preserved the issue. In particular, defendants argued in their posttrial motion that, although Dr. Hackell testified that Dr. Davis breached the standard of care at Nathan's two-year-old checkup and at all subsequent office visits by not referring him to a pediatric gastroenterologist, "there is absolutely no testimony from a witness—with proper foundation—that a pediatric gastroenterologist would have referred the patient to a surgeon." Defendants continued that "Dr. Hackell's testimony, over objection, that he would expect a workup by a pediatric gastroenterologist to include a workup for Hirschsprung['s] disease lacks foundation and is based entirely on speculation." Further, they asserted that "Dr. Hackell[,] as a pediatrician[,] does not have the foundation to testify what a reasonably careful pediatric gastroenterologist would have done to 'work-up' the cause of the constipation."

¶ 59    These assertions leave no doubt that Dr. Hackell's answer was a focus of defendants' motion. Short of quoting Dr. Hackell's testimony verbatim and at length, it is difficult to imagine

how defendants could have identified the challenged testimony with more specificity. Defendants thus adequately preserved this issue for review.

¶ 60 Turning to the merits, we note that the parties appear to disagree regarding the standard of review governing our analysis of the trial court's retroactive ruling striking Dr. Hackell's challenged testimony. Noting that the decision whether to admit expert testimony is within the sound discretion of the trial court (*Freeman v. Crays*, 2018 IL App (2d) 170169, ¶ 19), plaintiff asserts in her opening brief that the trial court's ruling striking Dr. Hackell's testimony was an abuse of discretion. Defendants likewise cited that standard in their brief. Plaintiff backtracks in her reply brief, however, where she advocates instead for *de novo* review of this issue. Plaintiff explains that she "initially assumed the standard of review was abuse of discretion because the issue was the admission of evidence, but [a] closer reading of the [trial court's order granting defendants' motion for judgment notwithstanding the verdict] shows the court found [Dr. Hackell] lacked foundation for the answer." She points to *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4-5 (2007), for the proposition that, because the trial court struck the testimony based on a threshold foundational determination, as opposed to a discretionary basis involving Dr. Hackell's qualifications and competency, our review of the evidentiary ruling should be *de novo*. See *Alm*, 373 Ill. App. 3d at 4 (explaining that trial courts follow a three-step analysis in determining whether a medical expert may testify, namely: (1) the expert must be a licensed member of the school of medicine about which the expert proposes to express an opinion; (2) the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other physicians; and (3) the trial court has the discretion to determine whether the physician is qualified and competent to state his opinion regarding the standard of care).

¶ 61    We need not determine which standard of review applies to our analysis of the trial court's retroactive ruling striking Dr. Hackell's testimony concerning his " 'expectation' of what [a pediatric gastroenterologist] would do" because, under either standard, our conclusion would be the same.  Put simply, Dr. Hackell's answer to the challenged question was supported by adequate foundation from the perspective of a reasonably careful pediatrician.  In striking the testimony, the trial court misapprehended the purpose and limited scope of Dr. Hackell's testimony.  Dr. Hackell did not offer this testimony to address the standard of care for a reasonably careful pediatric gastroenterologist or to opine regarding how a pediatric gastroenterologist would have evaluated Nathan had he been referred earlier.  Rather, Dr. Hackell provided this testimony expressly from his perspective as a pediatrician regarding what the standard of care required of a reasonably careful pediatrician.  In other words, Dr. Hackell confined his testimony to the realm of pediatrics and did not stray into the specialty of pediatric gastroenterology as the trial court erroneously believed, and as we explain below.

¶ 62    Dr. Hackell testified that, when presented with a child who has had chronic constipation, "the pediatrician has to perform a differential diagnosis," which he explained is a checklist that "includes a list of the potential causes of that symptom."  In Nathan's case, Hirschsprung's disease should have been significantly high on the differential diagnosis of a reasonably careful pediatrician because of the known association between Down syndrome and Hirschsprung's disease.  Indeed, the pediatrician should suspect the disease "in a child presenting with various symptoms."  Although Dr. Hackell did not quantify what he meant by "significantly," Dr. Ehrlich testified that Down syndrome is a significant risk factor for Hirschsprung's disease because five to ten percent of Down syndrome children have the disease.  Dr. Hackell also testified that he was aware of the disease as a general pediatrician because it is one of the many children's conditions

that he learned about during his training, and he had seen approximately a half-dozen patients with the disease. He stated that, in Nathan's case, a reasonably careful pediatrician "should have the child worked up for" Hirschsprung's disease. To have Nathan worked up for that disease and enable the pediatrician to either rule it in or rule it out on the differential diagnosis, Dr. Hackell testified that referral to a pediatric gastroenterologist was needed because pediatricians "don't do the testing" and thus do not "actually make the diagnosis of Hirschsprung['s disease]." As such, referral would be necessary to confirm or refute the pediatrician's suspicion of Hirschsprung's disease in a child with Down syndrome and a history of chronic constipation.

¶ 63    Against this backdrop, Dr. Hackell was qualified to testify that he would expect the evaluation by a pediatric gastroenterologist to include a workup for Hirschsprung's disease. Dr. Hackell testified that he had referred hundreds of children to pediatric gastroenterologists and, when he makes such a referral, he expects to receive a letter or report documenting the gastroenterologist's findings. As noted by plaintiff, because the referral would have been largely premised on the pediatrician's suspicion of Hirschsprung's disease, the pediatrician would reasonably expect to see Hirschsprung's disease addressed in the report. Plaintiff convincingly argues in her brief that, if the pediatrician received back a report that did not address Hirschsprung's disease, the pediatrician would refer the child to another gastroenterologist who "would report on the workup for the condition that was the reason for the referral." Indeed, plaintiff made this argument during a sidebar following defendants' objection to Dr. Hackell's testimony. Specifically, counsel asserted that, if Hirschsprung's disease "was absent from the evaluation, *** [and] if he's not being worked up for Hirschsprung's [disease] then, as a pediatrician, he's got to find a new pediatric gastroenterologist or pick up the phone and say why aren't we talking about Hirschsprung's [disease]." The challenged testimony was not offered for

the purpose of establishing what the pediatric gastroenterologist would do upon referral, but rather, it was offered to demonstrate what steps a reasonably careful pediatrician would take in "tick[ing] off" the possible causes of the chronic constipation from the pediatrician's differential diagnosis—with Hirschsprung's disease "significantly high" on that list. The distinction is subtle, but determinative here. Dr. Hackell plainly did not testify concerning the standard of care or the course of treatment a pediatric gastroenterologist would provide, but instead testified only as to the standard of care applicable to a pediatrician which, as a member of that specialty, he was qualified to do. Thus, the trial court erred in retroactively striking this testimony, and the jury was permitted to rely on it in drawing a causal connection between defendants' alleged deviation from the standard of care and Nathan's injury.

¶ 64                                Our Resolution

¶ 65    We now turn to the merits. A trial court should grant a motion for judgment notwithstanding the verdict (also known as judgment *non obstante veredicto*, or judgment *n.o.v.*) only in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). A judgment notwithstanding the verdict will be granted only if the plaintiff fails to prove an essential element of negligence, including proximate cause. *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 408 (2000). A motion for judgment notwithstanding the verdict presents a question of law concerning whether " 'there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case,' " when considering the evidence together with all reasonable inferences in the light most favorable to the plaintiff. *Jablonski v. Ford Motor Co.*,

2011 IL 110096, ¶ 88 (quoting *York*, 222 Ill. 2d at 178)). Because a motion for judgment notwithstanding the verdict presents a question of law, we review *de novo* the trial court's decision granting defendants' posttrial motion for judgment notwithstanding the verdict. See *Jablonski*, 2011 IL 110096, ¶ 88.

¶ 66　To prevail in a medical malpractice case, the plaintiff must prove (1) the standard of care against which the medical professional's conduct must be measured; (2) that the defendant was negligent by failing to comply with that standard; and (3) that the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress. *Freeman*, 2018 IL App (2d) 170169, ¶ 21. To establish proximate cause, a plaintiff must prove that the "defendant's negligence 'more probably than not' caused [the] plaintiff's injury." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997). "A plaintiff must present at least *some* evidence on every essential element of the cause of action[,] or the defendant is entitled to judgment in his or her favor as a matter of law." (Emphasis added.) *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). Proximate cause must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible. *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 843 (2010). "The question of whether defendant's negligent treatment is a proximate cause of plaintiff's ultimate injury is ordinarily one of fact for the jury." *Townsend*, 318 Ill. App. 3d at 410 (quoting *Holton*, 176 Ill. 2d at 107).

¶ 67　Here, because the trial court granted defendants' posttrial motion for judgment notwithstanding the verdict expressly because it found a fatal gap in plaintiff's causation evidence, the resolution of this appeal turns on whether plaintiff presented at least *some* evidence, when viewed in a light most favorable to plaintiff, that shows Dr. Davis' alleged deviation from the standard of care proximately caused Nathan's injury. See *Sullivan*, 209 Ill. 2d at 123; *Freeman*,

2018 IL App (2d) 170169, ¶ 21. Based on our review of the record, we conclude that plaintiff did present evidence to demonstrate causation, such that reversal is warranted.

¶ 68    Here, the posture of defendants' posttrial motion required the trial court to accept as true that Nathan had Hirschsprung's disease. Dr. Ehrlich testified that Nathan had the disease, and Dr. Calkins' pre- and post-surgery diagnoses were both Hirschsprung's disease. The acceptance of the fact of Hirschsprung's disease guides the analysis of the remaining issues, similar to how it guided Nathan's care after Dr. Davis referred him to a pediatric gastroenterologist just before he turned 16 years old.

¶ 69    Plaintiff's experts testified that Hirschsprung's disease is a congenital disorder, meaning present at birth. Nathan was born with the disease, and it was present at all stages of his care. For children older than three months, Hirschsprung's disease is diagnosed via a surgical biopsy of the very end of the gastrointestinal tract, and the specimen is sent to a pathologist for evaluation. Lack of ganglion cells, in addition to enlarged nerves that would otherwise connect to the ganglion cells, confirms Hirschsprung's disease. Dr. Calkins testified that an anorectal manometry is another way to diagnose Hirschsprung's disease, although it is "not the gold standard diagnosis" for it. In Nathan's case, Dr. Sood, a gastroenterologist, performed an anorectal manometry, and the results suggested Hirschsprung's disease. Dr. Ehrlich testified that, if Nathan had been worked up for Hirschsprung's disease at age two, it would require a biopsy. As testified by Dr. Ehrlich, because it is a congenital disorder, a biopsy at age two would have shown Hirschsprung's disease, just as it showed Hirschsprung's disease when Nathan was biopsied at age 16.

¶ 70    Drs. Ehrlich and Calkins agreed that there is no treatment for Hirschsprung's disease other than surgery. No medication can treat the disease, and it does not change or go away on its own. The pull-through procedure is the definitive surgery to treat the disease, wherein the portion of the

colon that lacks ganglion cells is removed, and the healthy part of the intestine, where ganglion cells are present, is pulled through and sewn to where the sphincter is. Although Dr. Calkins testified that Botox and other treatments can be given to patients with "really, really, really short segment [Hirschsprung's] disease," those are not permanent solutions. Botox is a temporizing measure that aims to get the internal anal sphincter to relax to help the patient pass stool. Any treatment other than surgery is temporizing. Dr. Ehrlich made clear his opinion that earlier intervention, when Nathan was two years old, would have increased his chances of avoiding a colostomy, enabled his colon to work better, and would have avoided years of constipation. He further testified that patients diagnosed and treated earlier have better outcomes. Nathan would "have had a much better chance at two than he did at 16."

¶ 71    Accepting the above evidence as true, we agree with plaintiff that Nathan's need for surgery was a foregone conclusion because it is the only way to treat Hirschsprung's disease. As such, surgery would result no matter when Dr. Davis referred Nathan to a pediatric gastroenterologist. Although direct testimony from a pediatric gastroenterologist certainly would have strengthened plaintiff's case at trial, based on the unique facts of this case and the disease itself, the absence of expert testimony from a pediatric gastroenterologist to confirm the inevitable referral to a pediatric surgeon to perform a biopsy and positively diagnose Hirschsprung's disease did not leave a "fatal gap" in plaintiff's causation evidence.

¶ 72    Plaintiff's standard-of-care expert, Dr. Hackell, testified that, in Nathan's case, Hirschsprung's disease would have been significantly high on a pediatrician's differential diagnosis, and a reasonably careful pediatrician "should have the child worked up for" the disease. Because timely referral to a pediatric gastroenterologist would have been premised on the pediatrician's own suspicion of Hirschsprung's disease, a reasonably careful pediatrician would

expect the disease to be addressed in the report he or she received back from a pediatric gastroenterologist. Dr. Calkins, the pediatric surgeon who twice operated on Nathan, testified that "the gold standard way" to definitively diagnose the disease is for a surgeon to biopsy the end of the gastrointestinal tract. A pathologist, in turn, examines the sample for evidence of ganglion cells. Dr. Ehrlich agreed that a full-thickness biopsy is needed to diagnose the disease in children older than three months, and the biopsy is a 15-minute surgical outpatient procedure under general anesthesia. Thus, the jury could reasonably conclude that a pediatric gastroenterologist would involve a pediatric surgeon to perform a biopsy because a biopsy is necessary to work up Hirschsprung's disease. In other words, because referral by a reasonably careful pediatrician to "have the child worked up for" Hirschsprung's disease would necessarily require a surgical biopsy, the absence of testimony from a pediatric gastroenterologist confirming the need for such a biopsy and referral to a surgeon to perform it does not leave a fatal gap in plaintiff's causation evidence.

¶ 73 In granting defendants' motion for judgment notwithstanding the verdict, the trial court suggested that perhaps a pediatric gastroenterologist, upon earlier referral, would have utilized medical management in a manner similar to Dr. Davis or would have tried Botox, like Dr. Sood, rather than refer Nathan for a biopsy in order to determine whether he had Hirschsprung's disease. It stated that, "[g]iven the entirety of Nathan's very unique presentation, it would be pure conjecture, speculation[,] and surmise to make any assumptions about how a pediatric gastroenterologist would choose to treat him." This reasoning impermissibly disregarded plaintiff's expert testimony that there is no treatment for the disease other than surgery and that any measures short of surgery are temporizing. As such, the jury did not need to speculate about what course of treatment Nathan would have been given had he been referred to a pediatric gastroenterologist at age two rather than age 15. Surgery was the only option.

¶ 74    We also agree with plaintiff that, in making these statements, the trial court apparently adopted defendants' jury argument that Nathan's condition influenced the diagnosis, rather than addressed the evidence in the light most favorable to plaintiff.  Nathan's disabilities were not in issue, however, because they did not impact either the diagnosis or treatment of the disease— Nathan needed a biopsy, and plaintiff's evidence demonstrated that a biopsy at age two would have revealed Hirschsprung's disease which, in turn, requires surgery.  Plaintiff's experts also agreed that if Hirschsprung's disease was considered, it requires referral to a surgeon to perform a biopsy and surgery to treat the condition.  The trial court's reasoning, in essence, presumed that a pediatric gastroenterologist, upon referral when Nathan was two years old, would have failed to consider Hirschsprung's disease, despite the known correlation between it and Down syndrome, for some 14 years.  In light of Dr. Hackell's testimony that Nathan should have been referred to a pediatric gastroenterologist based on a suspicion of Hirschsprung's disease at age two, the jury could expect, without resorting to conjecture, speculation, or surmise, that competent treatment by a pediatric gastroenterologist when Nathan was two years old would have confirmed Hirschsprung's disease sooner than 14 years later, when Nathan was eventually diagnosed.

¶ 75    The cases relied upon by the trial court in granting judgment notwithstanding the verdict are distinguishable, which we detail below.  In *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997), the appellate court affirmed the trial court's entry of judgment notwithstanding the verdict for the defendant based on a fatal gap in the plaintiff's proximate cause evidence.  The patient visited the emergency room complaining of numbness on the left side of his body.  *Id.* at 968.  After spending four to five hours in the emergency room, he was admitted to the hospital, where he began to suffer seizures.  *Id.*  He was then given a CT scan, and it revealed a massive intracerebral hemorrhage.  The patient lapsed into a coma and died three days later.  *Id.*

¶ 76    In a medical malpractice action against the hospital, the plaintiff's wife offered testimony from two expert medical witnesses, both of whom testified that the emergency room physician deviated from the standard of care by failing to order a CT scan while the patient was in the emergency room. *Id.* Specifically, the plaintiff's emergency medicine expert testified that a CT scan should have been immediately performed, and an earlier CT scan would have permitted either the medical or surgical intervention that may have saved the patient's life. *Id.* In his opinion, the patient would have had a greater than 50% chance of survival if he had been appropriately diagnosed, and the delayed CT scan was "definitely related" to the death. *Id.* at 969. On cross-examination, the emergency medicine expert acknowledged, however, that even assuming a prompt CT scan, he would have deferred to a neurosurgeon to decide whether surgical intervention was appropriate. The plaintiff's second expert was a neurologist. The neurologist testified that an earlier CT scan would have shown only a small bleed at that point and, had the patient been provided prompt treatment, he would have had a 75-80% chance of survival. The expert neurologist acknowledged, however, that he would have consulted and seriously considered, if not deferred to, a neurosurgeon's opinion about whether surgical intervention would have been appropriate following an earlier CT scan. He also did not know what a neurosurgeon would have done if called after an earlier CT scan. *Id.* at 970.

¶ 77    In affirming the trial court's ruling, the appellate court observed that the only two neurosurgeons who testified agreed with the treating neurologist that, even with an earlier CT scan, surgery would not have been appropriate because the patient's bleed was deep within his brain. *Id.* at 975. The court in *Aguilera* explained that:

> "[w]ithout supporting testimony from a neurosurgeon, plaintiff's experts' testimony was
> insufficient to show that neurosurgery, much less effective neurosurgery, should have

occurred absent defendants' negligence. *** The reasons for plaintiff's experts' opinions on proximate cause, as developed during direct and cross-examinations, failed to establish a predicate for their opinions about proximate cause. The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case."

¶ 78    In *Townsend*, 318 Ill. App. 3d 406, the plaintiff went to the emergency room complaining of a fever, backpain, and foul-smelling, cloudy urine. The emergency room attending physician examined her and provisionally concluded that she had a urinary tract or kidney infection. She was given antibiotics and intravenous fluids, as well as underwent blood tests and a urine culture. *Id*. at 407. She was admitted to the neurology floor but was later transferred to the intensive care unit, where she continued to receive antibiotics and fluids. Shortly after the transfer, the plaintiff's condition deteriorated rapidly, and she died. An autopsy revealed that the plaintiff had a kidney stone, which caused a severe infection, septic shock, and death. *Id*. at 408.

¶ 79    At trial, one of the plaintiff's experts testified that the attending physician deviated from the standard of care by failing to order imaging tests, which would have indicated whether the plaintiff had a urinary tract obstruction, and by transferring her to the neurology floor instead of the intensive care unit, and that these deviations contributed to the plaintiff's death. *Id*. at 410. The expert opined that the plaintiff's chance of survival would approach zero without removal of the obstruction but, if the kidney stone had been diagnosed and treated in the emergency room, she would have had a 40%-60% chance of survival. *Id*. at 411. However, the expert acknowledged that, had the attending physician complied with the standard of care by ordering an imaging test and diagnosing the kidney stone, the attending physician would not have been the medical

professional to "provide the next intervention." Instead, a urologist or an interventional radiologist, "both of which [were] outside [her] area of expertise, would have determined what course of treatment would have been best for the plaintiff. *Id*. at 411. The plaintiff presented no expert testimony from a radiologist or a urologist.

¶ 80 Mindful of *Aguilera*, the *Townsend* court considered whether the record contained any evidence to support the opinion of the plaintiff's experts that the negligent delays lessened the effectiveness of the plaintiff's treatment. The court asked, "would an earlier imaging test or an earlier transfer to an intensive care unit 'have led to surgical intervention or other treatment that may have contributed to the decedent's recovery?' " *Id*. at 413 (quoting *Aguilera*, 293 Ill. App. 3d at 974). The *Townsend* court answered both questions in the negative and agreed with the defendants that there was a fatal gap in the plaintiff's proximate cause evidence because there was no evidence as to what a urologist or interventional radiologist would have done to relieve the obstruction. *Id*. at 414. The court stressed that "[n]o one said what the treatment would have been. No one said whether the right treatment was available or whether [the plaintiff] was a candidate for it." *Id.* The court reasoned that, without expert testimony to guide its consideration, the jury was left to speculate about proximate cause. *Id*. at 414. The *Townsend* court vacated the jury's verdict in favor of the plaintiff and remanded for the trial court to enter judgment in favor of the defendants. *Id*. at 415.

¶ 81 In *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289 (2008), the patient went to an urgent care facility complaining of a severe headache. *Id*. at 290. The defendant, a family practice physician, diagnosed her with sinusitis and eustachian tube dysfunction, and he sent her home with antibiotics. The defendant did not order a CT scan or a neurological consultation. *Id.* The patient went to the emergency room the next day after her symptoms worsened. An emergency room

physician ordered a CT scan and it, upon review by a neuroradiologist, revealed a colloid cyst in the patient's brain. Early the next morning, the patient was transferred to another hospital, and surgical removal of the cyst was scheduled for later that morning. Before surgery, the patient's condition worsened, and she suffered a brain herniation. As a result of the herniation, the patient experienced irreversible brain damage that ultimately led to her death nearly four years later. *Id*. at 291.

¶ 82    In a medical malpractice action, the plaintiff's expert in family medicine testified that the urgent-care doctor who initially evaluated the patient deviated from the standard of care by not ordering a CT scan and a neurological consultation. *Id*. at 295. The expert acknowledged that he could not interpret the standard of care for a neurologist or neurosurgeon, but nevertheless asserted that he had knowledge of what a neurologist or neurosurgeon would have done for the patient, stating the neurologist or neurosurgeon would "rule out some sort of intracranial process with detailed neurological exam, CBC, sed rate, and CT or MRI of the brain or both." *Id*. at 295-96. The plaintiff's expert agreed, however, that it would be "pure speculation" to state when definitive treatment for the cyst would have occurred, but he stressed that "it would have been sooner [without the breach in the standard of care], and sooner would have been better." *Id*. at 297.

¶ 83    Relying on *Aguilera* and *Townsend*, the *Wiedenbeck* court concluded that the plaintiff failed to offer evidence to a reasonable degree of medical certainty regarding proximate cause—namely that the alleged negligent delay in administering a CT scan lessened the effectiveness of the patient's treatment. *Id*. at 298. It stressed that the plaintiff's family medicine expert agreed that it would be "pure speculation" to state when definitive treatment would have been undertaken had the defendant ordered a CT scan, and that all he could say regarding causation was that treatment "would have been sooner, and sooner would have been better." *Id*. at 299. It also noted

that the plaintiff's neurology expert admitted that, although some type of abnormality would have been observable on an earlier CT scan, he did not know whether the findings of an earlier CT scan would have warranted intervention prior to when the herniation occurred. *Id.* As such, neither expert's testimony suggested that an earlier CT scan would have led to earlier treatment or earlier surgical intervention. The court also stressed that the urgent-care doctor would have had to consult and defer to a neurologist or neurosurgeon concerning the patient's treatment if an earlier CT scan or neurological consult had been ordered. *Id.*

¶ 84    In *Freeman*, 2018 IL App (2d) 170169, after her husband died suddenly of cardiac arrest, the plaintiff brought suit against the defendant, a family practitioner, alleging the doctor breached the standard of care by failing to diagnose her husband's enlarged heart or his coronary artery disease and by failing to refer to him to a cardiologist. Prior to trial, the trial court granted a motion *in limine* barring the plaintiff's expert family practitioner from offering any opinions as to the standard of care for a cardiologist or as to any treatments that a cardiologist would have recommended upon referral. *Id*. ¶¶ 6-7.

¶ 85    During deposition, the plaintiff's expert testified that he had to refer patients to specialists for problems that were outside of his "skill set" as a family practitioner. He explained that, if a patient has cardiovascular problems, he could "do the work-up *** [and] try to make a diagnosis. But 100 percent of the time, [he] need[ed] to call in a cardiologist to complete the evaluation of the patient and *** often to complete the treatment of the patient." *Id*. ¶ 7. Over objection, when asked whether the defendant's failure to refer the patient to a cardiologist deprived him of a chance to survive, the plaintiff's expert answered that it did, because a cardiologist would have taken steps to improve the patient's cardiac circulation. *Id.* The expert admitted, however, that he was uncertain how a cardiologist would have treated the patient, even though he worked closely with

cardiologists and was familiar with the treatments one may have provided. *Id*. The expert repeatedly admitted that he could not say what a cardiologist would have done. *Id*. ¶ 8. The trial court sustained many of the defendant's objections when the parties next appeared in court, and it barred the expert from opining that a cardiologist would have prevented the patient's sudden death. *Id*. In so ruling, the trial court stated that "[t]here is simply no way for [plaintiff's expert], a family doctor, to testify as to causation without the qualified testimony of a cardiologist because every single thing that he testifies is a deviation of the standard of care for [the defendant] results in a referral to a cardiologist." *Id*. The next day, the plaintiff voluntarily dismissed her complaint without prejudice, and she re-filed her complaint the following week. *Id*. ¶ 9. When it was revealed that the plaintiff intended to disclose an expert cardiologist, the trial court granted defendant's motion to adopt the discovery orders and *in limine* rulings from the prior case. *Id*. ¶ 11. The defendant thereafter sought and received summary judgment in his favor. *Id*. ¶¶ 13-14.

¶ 86    On appeal, we concluded that the trial court did not abuse its discretion in barring the plaintiff's expert's opinions on causation. We pointed to the expert's testimony that he referred all his patients with cardiovascular issues to a cardiologist, and that he did not "have the skill, or the training, or the knowledge to complete a detailed and comprehensive cardiac work-up." Moreover, although he was aware generally of the treatments a cardiologist may have recommended, the plaintiff's expert testified that the choice of which procedure to implement would be left to a cardiologist, and that he would need to consult a cardiologist to determine even if it were safe to administer lipid-lowering drugs to the patient. *Id*. ¶ 33. As such, the expert lacked foundation to testify to a reasonable degree of medical surgery as to how a cardiologist would have effectively treated the patient. *Id*. In so holding, we concluded that the expert's opinions on causation were contingent and speculative, and that "it was not enough for [the expert] to simply

testify that, if defendant had referred [the patient] to a cardiologist, a cardiologist could have administered a treatment plan that could have prolonged [the patient's] life." *Id*. ¶ 36.

¶ 87     At the outset, we note that all of the above cases, as relied on by defendants, involved patients who died allegedly as a consequence of a failure to diagnose. As such, unlike the instant matter, the proposed curative treatment was never provided in the defendants' cited cases. More critically, however, these cases are distinguishable because they all involved the absence of expert testimony from the very medical professional who would have been tasked with providing the curative medical intervention that, as argued by the respective plaintiffs, was needed to either save or prolong the patient's life. We note that defendants conceded at oral argument that each of their cited cases lacked testimony from the medical professional who would have provided said curative intervention. In *Aguilera*, for example, the plaintiff offered no expert testimony from a neurosurgeon to explain that neurosurgery or some other treatment should have occurred absent the defendant's negligence. In *Townsend*, the plaintiff offered no testimony from either an interventional radiologist or a urologist to explain what they would have done to remove the obstruction from the patient's urinary tract or whether the patient was a candidate for that treatment. In *Wiedenbeck*, there was no testimony from an expert neurologist or neurosurgeon stating that an earlier CT scan would have resulted in earlier treatment or surgical intervention. Finally, in *Freeman*, there was no testimony from an expert cardiologist concerning how he or she would have treated the patient had he been referred to a cardiologist. Here, unlike in the cases cited by defendants, plaintiff identified the specific treatment necessary to address Nathan's Hirschsprung's disease had it been diagnosed at age 2, namely, a surgical pull-through procedure, and that testimony was offered by Drs. Ehrlich and Calkins—both pediatric surgeons. Indeed, Dr. Calkins testified that he twice operated on Nathan and successfully treated Nathan with a

colostomy. Although a pull-through procedure was no longer a viable option to treat Nathan at age 16, Dr. Calkins made clear that, if Nathan had come into his care at age 2, he would have confirmed a diagnosis of Hirschsprung's disease and would have performed a pull through procedure—most likely over the course of two surgeries.

¶ 88 *Walton v. Dirkes*, 388 Ill. App. 3d 58 (2009), provides a more analogous scenario to the instant matter, where the appellate court reversed the trial court's entry of judgment notwithstanding the verdict. There, the patient went to his primary care physician complaining of congestion and a sore throat, and the defendant physician told him it was allergies or a viral infection. The patient returned one month later complaining of new symptoms, and the defendant diagnosed him with throat inflammation. *Id.* at 58. Five days later, the patient was taken to the emergency room, and a complete blood count (CBC) revealed that his white blood cell count was well above the normal range. *Id.* He was diagnosed with acute lymphoblastic leukemia (ALL) before he died the following day of cardiac arrest related to ALL. *Id.* at 58-59.

¶ 89 The patient's estate filed a medical malpractice suit against the primary care physician, arguing that he negligently failed to order a CBC at both office visits, and that failure harmed the plaintiff because an earlier CBC would have led to the diagnosis and treatment of ALL. *Id.* at 63. A jury found in favor of the plaintiff, but the trial judge entered a judgment *n.o.v.*, reasoning that there was a gap in the plaintiff's causation evidence because the plaintiff presented no testimony concerning what type of specialist the defendant would have consulted to review the results if the defendant had ordered a CBC, what that specialist would have seen in the CBC results that would have indicated ALL, or how a CBC, interpreted by anyone, would have indicated ALL. The trial court concluded that there was no expert testimony linking the defendant's failure to order a CBC

with testimony indicating how ALL could have been diagnosed had the defendant ordered a CBC. *Id*. at 59.

¶ 90    In reversing the trial court, the appellate court reasoned that, unlike in *Aguilera* and *Townsend*, the plaintiff offered evidence to a reasonable degree of medical certainty that the defendant's failure to order a CBC resulted in a delayed diagnosis and lessened the effectiveness of treatment. *Id*. at 67-68.  In recounting the evidence that told the strongest story in support of the jury's verdict, the *Walton* court noted that a family practice expert testified that the defendant deviated from the standard of care by not ordering a CBC and, in his view, a CBC would likely have been abnormal such that it would have "given him a hint" that there was a problem and would have led to the diagnosis of ALL.  Regarding causation, the appellate court pointed to the plaintiff's oncology expert, which it stated provided "the strongest evidence of proximate cause."  The oncology expert testified that ALL cannot be diagnosed without blood work and, had the defendant ordered a CBC, the result would have been abnormal, the patient would have been given "some very specific chemotherapy treatments," and the cure rate would have approached 50 to 60 percent. *Id*. at 64.  The oncologist further testified that, given the patient's elevated white blood cell count in the emergency room, his blood counts would have been abnormal for at least several months prior to his hospitalization, and the patient could have been diagnosed and treated very quickly had the defendant ordered a CBC. *Id*. at 68.  Finally, the court pointed to the testimony of both the emergency room physician and hematologist who treated the patient in the hospital, both of which testified as to how the patient was diagnosed with ALL. *Id*. at 68-69.  The court concluded that, taken together, the expert testimony supported the jury's verdict such that the trial court erred in entering judgment notwithstanding the verdict. *Id*. at 69.

¶ 91    Here, an outcome like that in *Walton* is appropriate. Similar to the testimony from the family practice expert in *Walton*, namely that testing requiring interpretation by a specialist was needed that "would have led to the diagnosis," Dr. Hackell testified that Dr. Davis should have referred Nathan to a pediatric gastroenterologist to diagnose the cause of his constipation, with Hirschsprung's disease "significantly high" on his differential diagnosis. Again, Dr. Hackell testified that a reasonably careful pediatrician, in Nathan's case, "should have the child worked up for" Hirschsprung's disease. Referral to a pediatric gastroenterologist was necessary to either rule in or rule out Hirschsprung's disease because pediatricians "don't do the testing," similar to the need for a CBC in *Walton*. When Dr. Hackell makes such a referral, he expects a report back from the specialist and, in Nathan's case, he would expect the gastroenterologist's report to include a workup for Hirschsprung's disease. As testified by Dr. Calkins, to definitively diagnose Hirschsprung's disease, a surgeon must biopsy the end of the gastrointestinal tract and send the specimen to a pathologist for review. Dr. Ehrlich testified that a biopsy is "the first thing that you would do" when presented with a child with Down syndrome and a history of constipation. Because it is a congenital disorder, a biopsy at age two would have shown Hirschsprung's disease just as it did at age 16, and earlier surgical intervention, likely a pull-through procedure over the course of two surgeries, would have prevented years of constipation and lessened Nathan's chances of needing a colostomy. As such, the testimony offered by plaintiff's experts established to a reasonable degree of medical certainty that, had Dr. Davis referred Nathan to a pediatric gastroenterologist at age two based on a suspicion of Hirschsprung's disease, it would have led to a diagnosis of that disease and would have prompted the necessary surgical intervention to occur years earlier. The expert medical testimony provided by Drs. Calkins and Ehrlich tracks that which was offered by the expert oncologist in *Walton*, where he testified that ALL cannot be diagnosed

without a CBC, the result of the CBC would have been abnormal had the defendant ordered one, and the plaintiff could have been treated with various chemotherapies that would have improved the patient's chances of survival or otherwise prolonged his life. Just as in *Walton*, the expert testimony in the instant case adequately supports the jury's verdict.

¶ 92    In addressing plaintiff's reliance on *Walton*, defendants argue that, there, the gap in the plaintiff's proximate cause evidence was filled by the testimony of the hematologist, whereas here, the causation gap was left unfilled. Defendants' argument overstates the importance of the testimony offered by the hematologist who treated the patient in *Walton*. Although the *Walton* court noted that the emergency room physician and hematologist provided a causal connection regarding how diagnosis and treatment would have resulted if the defendant had ordered a CBC (*id*. at 69), it made clear that the "strongest evidence of proximate cause" was provided by the oncologist's testimony which, as we note above, is akin to that provided here by Drs. Calkins and Ehrlich. In any event, *Walton* confirms that the hematologist and emergency room physician testified only as to how the patient was diagnosed with ALL. *Id.* at 68-69. Here, that testimony was provided by each of plaintiff's medical experts. Specifically, Dr. Hackell testified that Nathan was diagnosed with Hirschsprung's disease following Dr. Burress' coordination of a suction biopsy. Similarly, Dr. Ehrlich testified that Nathan had Hirschsprung's disease because the pathology report for Nathan's 2013 biopsy performed by Dr. Thayer met the criteria for the disease. Finally, Dr. Calkins' pre-surgery and post-surgery diagnoses were Hirschsprung's disease.

¶ 93    As a final matter, we address the alternate basis provided by the trial court for its ruling granting defendants' posttrial motion for judgment notwithstanding the verdict, namely that plaintiff failed to present sufficient evidence of proximate cause from a "lost chance" of effective

treatment perspective. In the final paragraph of its written ruling, the trial court stated that there was insufficient expert testimony that an earlier diagnosis of Hirschsprung's disease more probably than not would have led to a pull-through procedure that would have been effective in preventing further constipation or obviated the need for a colostomy. In support, the trial court pointed to (1) Dr. Ehrlich's testimony that most children with severe constipation do not have surgery and that, even after a pull-through procedure, most children have ongoing constipation or incontinence and will be incontinent without a colostomy; and (2) Dr. Calkins' testimony that a pull-through procedure was too risky for Nathan because of Nathan's low functional abilities and the risk of incontinence.

¶ 94     In *Holton*, 176 Ill. 2d at 119, our supreme court clarified that the "lost chance" doctrine is not a separate theory of recovery but is a concept that enters into the analysis of proximate cause in medical malpractice suits when the plaintiff alleges that the defendant's negligent delay in diagnosis or treatment lessened the effectiveness of treatment. *Id*. The court stated that, "[t]o the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance recovery." *Id.*

¶ 95     We agree with plaintiff that, in concluding that plaintiff did not present sufficient evidence of proximate cause from a lost chance of effective treatment perspective, the trial court inappropriately reweighed the testimony. It is well established that it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony. *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). A trial court may not reweigh the evidence and set aside a verdict merely because the jury

could have drawn different inferences or conclusions, or because the trial court believes that other results are more reasonable. *Id.*

¶ 96    Here, the trial court erroneously relied, in part, on Dr. Ehrlich's agreement during cross-examination that most children with severe constipation do not get surgery. Whether a child with severe constipation would require surgery is irrelevant to whether a child, like Nathan, who had Hirschsprung's disease, required surgery. He would not fall within the category of "most children" who do not need surgery, because Nathan was a member of a subgroup of children who have Hirschsprung's disease, which is a condition whose only treatment is surgery. Moreover, in agreeing that most children with severe constipation do not get surgery, Dr. Ehrlich made clear that he agreed with the statement because only some causes of constipation require surgical intervention.

¶ 97    Next, although Dr. Ehrlich testified that most children have ongoing constipation or incontinence even after a pull-through procedure, this testimony was contradicted by Dr. Calkins, who testified that constipation goes away for the majority of patients who have a pull-through procedure. Dr. Calkins further testified that some children with Down syndrome do not do as well after a pull-through procedure due to behavioral issues or biological reasons, which the medical community did not yet understand. Still, the jury was permitted to give more weight to Dr. Calkins' testimony on this issue and conclude that Nathan, more probably than not, would have been among those patients who "do extraordinarily well with the same operation" had he been diagnosed at age two and undergone a pull-through procedure over the course of two surgeries. Although Dr. Calkins did not recommend a pull-through procedure for Nathan at age 16, that did not mean he would not have recommended the procedure at age two. To the contrary, he testified that he would have treated Nathan by confirming Hirschsprung's disease and performing a pull-

through procedure conservatively over the course of two surgeries. Put simply, this testimony was offered to a reasonable degree of medical certainty and supported the jury's determination that Dr. Davis' deviation from the standard of care proximately caused the increased risk of harm or lessened the effectiveness of Nathan's treatment.

¶ 98                                    III. CONCLUSION

¶ 99     For the reasons stated, we reverse the order of the circuit court of Winnebago County granting defendants' motion for judgement *n.o.v.*, and we reinstate the jury's verdict in favor of plaintiff.

¶ 100   Reversed.